IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

KENDRICK ANTONIO SIMPSON,      )
                               )
         Petitioner,           )
                               )
vs.                            )      Case No.  CIV-11-96-M
                               )
KEVIN DUCKWORTH, Interim Warden, )
     Oklahoma State Penitentiary, )
                               )
         Respondent.[1]         )

## MEMORANDUM OPINION

Petitioner, a state court prisoner, has filed a petition for writ of habeas corpus seeking

relief pursuant to 28 U.S.C. § 2254.  Doc. 23.  Petitioner challenges the convictions entered

against him in Oklahoma County District Court Case No. CF-06-496.  Tried by a jury in

2007, Petitioner was found guilty of first degree murder (Counts 1 and 2), discharging a

firearm with intent to kill (Count 3), and possession of a firearm after former felony

conviction (Count 4).  Petitioner received a life sentence for Count 3 and a 10-year

concurrent sentence for Count 4.  For Counts 1 and 2, Petitioner was sentenced to death.  In

support of both death sentences, the jury found four aggravating circumstances:

(1) Petitioner was previously convicted of a felony involving the use or threat of violence to

the person; (2) Petitioner knowingly created a great risk of death to more than one person;

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Kevin Duckworth, who currently serves as interim
warden of the Oklahoma State Penitentiary, is hereby substituted as the proper party respondent in
this case.

(3) the murder was especially heinous, atrocious, or cruel; and (4) the existence of a probability that Petitioner would commit criminal acts of violence that would constitute a continuing threat to society (O.R. III, 529-31, 583-87; O.R. IV, 612, 665-69; J. Tr. VI, 110-11; J. Tr. VIII, 65-67, 83). With respect to Count 2, the murder of Anthony Jones, the especially heinous, atrocious, or cruel aggravator was later stricken.[2]

Petitioner has presented eighteen grounds for relief. Respondent has responded to the petition and Petitioner has replied.[3] Docs. 23, 49, and 63. In addition to his petition, Petitioner has filed motions for discovery and an evidentiary hearing. Docs. 42 and 51. After a thorough review of the entire state court record (which Respondent has provided), the pleadings filed in this case, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to his requested relief.

## I. Procedural History.

Petitioner appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). The OCCA affirmed in a published opinion. Simpson,

---

[2] The record reflects that the jury was erroneously instructed on this aggravator with respect to Mr. Jones because the State never alleged its application to his murder. This error was remedied on appeal. Simpson v. State, 230 P.3d 888, 903 & n.10 (Okla. Crim. App.), reh'g granted, 239 P.3d 155 (Okla. Crim. App. 2010).

[3] In both the petition and reply, Petitioner continues to assert that additional pages are needed to adequately present his claims. Petition, pp. 63 n.26, 64 n.28; Reply, p. 19 n.4. In the course of this proceeding, Petitioner made three separate requests for an extension of the page limitations imposed by General Order 10-1. Docs. 19, 21, and 61. All three requests were denied. Docs. 20, 22, and 62. Petitioner has given the Court no reason to question its previous orders. General Order 10-1, which permits a 100-page petition and a 25-page reply, is both generous and reasonable, and although it allows for additional pages upon a showing of good cause, Petitioner has failed to make this showing.

230 P.3d at 907. Petitioner sought review of the OCCA's decision by the United States Supreme Court. His petition for writ of certiorari was denied on January 18, 2011. Simpson v. Oklahoma, 562 U.S. 1185 (2011). Petitioner also filed two post-conviction applications, which the OCCA denied in unpublished opinions. Simpson v. State, No. PCD-2012-242 (Okla. Crim. App. Mar. 8, 2013); Simpson v. State, No. PCD-2007-1262 (Okla. Crim. App. Oct. 13, 2010).

## II. Facts.

In adjudicating Petitioner's direct appeal, the OCCA set forth a summary of the facts. Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." Although this presumption may be rebutted by Petitioner, the Court finds that Petitioner has not done so, and that in any event, the OCCA's statement of the facts is an accurate recitation of the presented evidence. Thus, as determined by the OCCA, the facts are as follows:

> On the evening of January 15, 2006, Jonathan Dalton, Latango Robertson and [Petitioner] decided to go to Fritzi's hip hop club in Oklahoma City. Prior to going to the club, the three drove in Dalton's white Monte Carlo to [Petitioner's] house so that [Petitioner] could change clothes. While at his house, [Petitioner] got an assault rifle which he brought with him.[FN3] Before going to Fritzi's, the men first went to a house party where they consumed alcohol and marijuana. When they left the party, [Petitioner] put the assault rifle into the trunk of the Monte Carlo, which could be accessed through the back seat.

> FN3. There was testimony that this weapon was an AK–47 or SKS assault rifle.

> The three arrived at Fritzi's between midnight and 1:00 a.m. on January 16. Once inside, they went to the bar to get a drink. [Petitioner] and

Dalton also took a drug called "Ecstasy." After getting their drinks, Dalton and Robertson sat down at a table while [Petitioner] walked around. When [Petitioner] walked by London Johnson, Anthony Jones and Glen Palmer, one of the three apparently said something to him about the Chicago Cubs baseball cap that he was wearing. [Petitioner] went back to the table and told Dalton and Robertson that some guy had given him a hard time about his cap. At some point, [Petitioner] approached Johnson, Jones and Palmer again. During this encounter, [Petitioner] told them that he was going to "chop" them up.[FN4] After making this threat, [Petitioner] walked away. He returned a short time later and walked up to Palmer. [Petitioner] extended his hand and said, "We cool." Palmer hit [Petitioner] in the mouth knocking him to the floor. [Petitioner] told Dalton and Robertson that he wanted to leave and the three of them left the club.

> FN4. Johnson testified at trial that this meant to him that [Petitioner] was going to shoot at them with a "chopper" which was an AK–47.

Out in the parking lot, [Petitioner], Dalton and Robertson went to Dalton's Monte Carlo. Before leaving, they talked with some girls who had come out of the club and were parked next to them. The girls told the men to follow them to a 7–11 located at NW 23rd Street and Portland. When they arrived at the store, [Petitioner], Dalton and Robertson backed into a parking space toward the back door and the girls pulled in next to the pumps. While the men were sitting in the Monte Carlo, they saw Johnson, Jones and Palmer drive into the parking lot in Palmer's Chevy Caprice. They recognized Palmer as the person who had hit [Petitioner] at Fritzi's. Dalton told [Petitioner] to "chill out" but [Petitioner] was mad and wanted to retaliate against Palmer. When Palmer drove out of the parking lot onto 23rd Street and merged onto I–44, [Petitioner] told Dalton to follow them.

While they were following the Chevy, [Petitioner], who was sitting in the front passenger seat, told Robertson, who was sitting in the back seat, to give him the gun. He told Robertson that if he had to get the gun himself, there was going to be trouble. Robertson reached through the back seat into the trunk and retrieved the gun for [Petitioner]. Dalton followed the Chevy as it exited the interstate onto Pennsylvania Avenue. He pulled the Monte Carlo into the left lane beside the Chevy as they drove on Pennsylvania Avenue and [Petitioner] pointed the gun out his open window and started firing at the Chevy.

When the Chevy was hit with bullets, Palmer was driving, Jones was sitting in the front passenger seat and Johnson was in the back seat. Johnson heard about twenty rapid gun shots and got down on the floor of the car. He did not see the shooter but noticed a white vehicle drive up beside them. The Chevy jumped the curb and hit an electric pole and fence before coming to a stop. Palmer and Jones had been shot. Jones had been shot in the side of his head and torso and was unconscious. Palmer had been shot in the chest. He was initially conscious and able to talk but soon lost consciousness when he could no longer breathe. Johnson tried to give both Jones and Palmer CPR but was unsuccessful. He flagged down a car that was driving by and asked the driver to get help. Both Palmer and Jones died at the scene from their gunshot wounds.

After he fired at the Chevy, [Petitioner] said, "I'm a monster. I just shot the car up." He added, "They shouldn't play with me like that." Dalton kept driving until they reached a residence in Midwest City where he was staying. They dropped the gun off and switched cars, and then Dalton, Robertson and [Petitioner] went to meet some girls they had talked to at Fritzi's.

Simpson, 230 P.3d at 893-94.

### III.  Standard of Review.

### A.    Exhaustion as a Preliminary Consideration.

The exhaustion doctrine is a matter of comity.  It provides that before a federal court

can grant habeas relief to a state prisoner, it must first determine that he has exhausted all of

his state court remedies.  As acknowledged in Coleman v. Thompson, 501 U.S. 722,

731 (1991), "in a federal system, the States should have the first opportunity to address and

correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine

has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b).

Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be

denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

**B.    Procedural Bar.**

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim.  "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman, 501 U.S. at 729).  "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30.

**C.    Merits.**

When a petitioner presents a claim to this Court, the merits of which have been addressed in state court proceedings, 28 U.S.C. § 2254(d) governs his ability to obtain relief. Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (acknowledging that the burden of proof lies with the petitioner).  Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The focus of Section 2254(d) is on the reasonableness of the state court's decision. "The question under AEDPA [Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrington v. Richter, 562 U.S. 86, 102 (2011). Relief is warranted only "*where there is no possibility* fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Id. (emphasis added). The deference embodied in "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. at 102-03 (citation omitted). When reviewing a claim under Section 2254(d), review "is limited to the record that was before the state court that adjudicated the claim on the merits." Pinholster, 563 U.S. at 181.

## IV.  Analysis.

**A.     Ground 1:     Failure to Instruct on Second Degree Murder as a Lesser Included Offense.**

In his first ground for relief, Petitioner asserts that the jury should have been instructed on second degree murder as a lesser included offense.  He contends that the absence of this instruction constitutes a violation of Beck v. Alabama, 447 U.S. 625 (1980).  Although Petitioner argued on direct appeal that this instruction should have been given to the jury, Respondent asserts that Petitioner failed to fairly present the Beck claim he now raises.  Accordingly, Respondent contends that Petitioner's Ground 1 is unexhausted and subject to procedural default. However, Respondent also presents an alternative argument that even under de novo review, Petitioner's Beck claim does not warrant habeas relief.

In denying Petitioner relief on this claim, the OCCA rejected Petitioner's argument that "there was no evidence that he intended to kill his victims." Simpson, 230 P.3d at 897.

> In light of the testimony that [Petitioner] threatened to "chop" up Palmer and his companions, instructed Dalton to follow Palmer's car and then shot as many as twenty rounds at the moving vehicle with an assault rifle, we find that the evidence did not reasonably support the conclusion that [Petitioner] did not intend to kill the men in the Chevy. An instruction on Second Degree Depraved Mind Murder was not warranted by the evidence and the trial court did not abuse its discretion in declining to give this instruction *sua sponte*.

Id.  Although Petitioner asserts that this holding is contrary to and an unreasonable application of Beck, he nevertheless acknowledges two circumstances which without question remove him from the constitutional protections of Beck: (1) he did not request an instruction on second degree murder and (2) the jury was instructed on a lesser included

manslaughter offense. Therefore, it matters not whether Petitioner's Ground 1 is viewed with AEDPA deference because even under de novo review, Petitioner's claim fails.

In Beck, the Supreme Court addressed the constitutional ramifications of lesser-included instructions for a capital crime. Prior to Beck, the Supreme Court had "never held that a defendant is entitled to a lesser included offense instruction as a matter of due process." Beck, 447 U.S. at 637. In Beck, however, the Supreme Court carved out an exception for those high stake cases where the death penalty is a possible punishment.

> For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense–but leaves some doubt with respect to an element that would justify conviction of a capital offense–the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.
>
> Such a risk cannot be tolerated in a case in which the defendant's life is at stake. As we have often stated, there is a significant constitutional difference between the death penalty and lesser punishments . . . .

Id. Beck, therefore, requires a trial court in a capital case to give the jury a third option to convict the defendant for a lesser-included non-capital offense, when such lesser offense is supported by the evidence. Id. at 627.

The Tenth Circuit has repeatedly held that a petitioner may not prevail on a Beck claim premised on a lesser-included instruction he failed to request at trial. Grant v. Trammell, 727 F.3d 1006, 1011-13 (10th Cir. 2013). In Grant, the Tenth Circuit, citing its holding in Hooks v. Ward, 184 F.3d 1206 (10th Cir. 1999), noted that "[t]he Hooks rule is federal in nature, an explanation of what's required as a matter of federal due process doctrine to invoke Beck." Grant, 727 F.3d at 1011. "[A] state generally won't be said to

offend a defendant's due process right to particular instructions when it has no occasion to refuse a request for them." Id. at 1012. Since Hooks, the Tenth Circuit has "expressly and repeatedly" denied Beck relief in the absence of a request for the instruction at trial. Id. (citing Thornburg v. Mullin, 422 F.3d 1113, 1126-27 (10th Cir. 2005), and Darks v. Mullin, 327 F.3d 1001, 1007 (10th Cir. 2003), among others). The record in this case clearly shows that Petitioner failed to make a request for a second degree murder instruction (J. Tr. VI, 46, 50), and therefore, denial of Petitioner's Ground 1 is warranted on this basis.[4]

In addition, Petitioner's Beck claim fails because the jury was given the option of convicting him of a lesser included offense. The record reflects that with respect to both Counts 1 and 2, the jury was instructed on first degree manslaughter by misdemeanor, with the underlying misdemeanor being reckless conduct with a firearm (O.R. III, 569-73). Although Petitioner argues that this lesser included offense was a "ridiculous option" and that second degree depraved mind murder was the better option based on the presented evidence, Petition, p. 9, Beck does not require instructions on every lesser-included non-capital offense supported by the evidence. In Schad v. Arizona, 501 U.S. 624 (1991), the Supreme Court acknowledged the "strict holding of Beck" and found that when a jury is given a "'third option,'" Beck is not implicated because a jury is "not faced with an all-or-

---

[4] Here, and in his Ground 14, Petitioner has alleged that his trial counsel was ineffective for failing to request this instruction. Petition, pp. 9-10, 86-87. This claim will be considered among the many other allegations Petitioner makes against his trial counsel in Ground 14.

nothing choice between the offense of conviction (capital murder) and innocence." Schad, 501 U.S. at 645-48.

Although Petitioner attempts to distinguish his case from Schad, Schad makes clear that "the [Beck] rule is not implicated when the court instructs the jury on one lesser included offense supported by the evidence, even if instructions on other lesser included offenses might have been warranted." Bland v. Sirmons, 459 F.3d 999, 1016 (10th Cir. 2006) (citing Schad). See also Eizember v. Trammell, 803 F.3d 1129, 1146 (10th Cir. 2015) ("The [Supreme] Court explained [in Schad] that Beck doesn't guarantee multiple lesser-included offense instructions or the defendant's favorite such instruction."). Schad reinforces the narrow holding of Beck and its finding of a constitutional infirmity when a capital jury is not given a third option. Schad, 501 U.S. at 646-47. The third option is a lesser offense supported by the evidence – one which enhances the "rationality and reliability" of the jury deliberation process by giving the jury, who is otherwise convinced of a defendant's guilt but questions whether the evidence supports a capital crime, an acceptable middle ground choice. Spaziano v. Florida, 468 U.S. 447, 455 (1984), overruled on other grounds by Hurst v. Florida, 577 U.S. ___, 136 S. Ct. 616, 623 (2016). It is intended to avoid "the risk that the jury will convict, not because it is persuaded that the defendant is guilty of capital murder, but simply to avoid setting the defendant free." Id. In this case, the jury was given a third option. If Petitioner's intoxication prevented him from forming the specific intent required to find him guilty of first degree malice murder, then the jury had the option of finding him guilty of first degree manslaughter because he engaged in reckless conduct when he fired

multiple shots into a moving vehicle containing three occupants. For this reason as well, the Court concludes that Petitioner is not entitled to relief on his Ground 1.

Ground 1 is denied.

### B.     Ground 2:    PTSD Evidence.

In Ground 2, Petitioner asserts that he is entitled to habeas relief because the trial court prevented him from presenting evidence in the guilt stage that he suffered from Post Traumatic Stress Disorder (PTSD). Petitioner argues that this evidence was relevant to the issue of intent and his voluntary intoxication defense, and that because he was unable to present this evidence, he was denied his constitutional right to present a complete defense. Petitioner presented this claim to the OCCA on direct appeal. Respondent asserts that Petitioner's Ground 2 should be denied because Petitioner has failed to show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law. The Court agrees with Respondent.

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294 (1973). "The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." Id. However, these rights are not absolute. "While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence . . . ." Holmes v. South Carolina, 547 U.S. 319, 326 (2006). See

United States v. Scheffer, 523 U.S. 303, 308 (1998) ("[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."); Taylor v. Illinois, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.").

Prior to trial, Petitioner filed a notice of intent "to offer evidence . . . of his mental, emotional, psychologic and/ psychiatric condition before, during and after the time of the alleged offense . . ." (O.R. III, 421-22). The State filed a motion to preclude such evidence in the first stage, and after a hearing on the matter, the State's motion was granted (O.R. III, 501-06, 516-17; M.Tr. 9/19/07, 3-25). At trial, Dr. Phillip Massad, a clinical psychologist, testified in the punishment stage that he had evaluated Petitioner and determined that Petitioner "more likely than not" had PTSD (J. Tr. VII, 160-63). Dr. Massad explained that someone with PTSD "might be hypersensitive and overreact," "become hypervigilant," and "might have an exaggerated startle response" (J. Tr. VII, 166-67). Dr. Massad also testified that drugs or alcohol might "increase the likelihood that [someone with PTSD] would react or overreact" (J. Tr. VII, 167). Dr. Massad opined that Petitioner's criminal actions "might be consistent with somebody who has PTSD and is reacting to the present situation in a way as influenced by past history and what's already happened to them" (J. Tr. VII, 168). On cross-examination, Dr. Massad made it clear that he did not evaluate Petitioner's criminal responsibility and that his opinion did not include a determination that Petitioner did not know right from wrong when he shot and killed the victims (J. Tr. VII, 178).

In denying Petitioner relief on this claim on direct appeal, the OCCA applied applicable Supreme Court authority, concluding that Petitioner was not denied his constitutional right to present a defense because the PTSD evidence was not relevant to the issues to be determined in the guilt stage.  <u>Simpson</u>, 230 P.3d at 894-95.

> [Petitioner] argues that the evidence that he suffered from PTSD was relevant to the issue of his intent at the time of the offense. The transcript of the hearing on the State's motion to preclude defense testimony about PTSD in the first stage of trial reveals that after speaking with Dr. Massad and reviewing his report, the prosecutor believed that Dr. Massad would not be able to testify that [Petitioner's] PTSD precluded [Petitioner] from forming the intent to kill. Contrary to this, the defense counsel believed that Dr. Massad would testify that "it is possible that the PTSD affected him to the extent that he was not able to form the specific intent." Although Dr. Massad did not testify at the motion hearing, he did testify during the second stage of [Petitioner's] trial. At trial, Dr. Massad testified that although PTSD, especially when combined with alcohol and drug usage, could make a person hypersensitive and increase the likelihood that they would overreact to a situation, he acknowledged that he had not administered tests on [Petitioner] to determine whether [Petitioner] knew what he was doing at the time of the shooting. Thus, Dr. Massad could not testify as to how [Petitioner's] PTSD could affect his intent at the time of the crime.
>
> The record before this Court supports the prosecutor's position that Dr. Massad could not testify that [Petitioner's] PTSD precluded him from forming the intent to kill. Accordingly, the evidence that Petitioner suffered from PTSD was neither relevant to the intent element of the crime charged nor was it relevant to his defense of voluntary intoxication, which requires a showing that [Petitioner's] intoxication rendered it impossible to form the intent element of the crime charged. The trial court's ruling precluding the defense from presenting this evidence during the first stage of trial was not an abuse of discretion and did not deprive [Petitioner] of his constitutional right to present a defense. There was no error here.

<u>Id.</u> at 895 (citation omitted).

Petitioner's challenge to the OCCA's decision is a simple one. Whereas the OCCA found the PTSD evidence to be irrelevant to first stage issues, Petitioner contends just the opposite. Petitioner's primary argument is that the evidence was relevant as an explanation to the jury for why he acted like he did, i.e., why he was hyperviligant and overreacted. Petition, pp. 12-14. Petitioner contends that "[h]ad Dr. Massad been allowed to testify, jurors would have been given an explanation of how an individual suffering from . . . PTSD can react out of an exaggerated sense of fear and terror . . . ." Petition, p. 14. Petitioner additionally contends that the drugs and alcohol he consumed that night exacerbated the situation, and that had the jurors heard this evidence, "they would have understood that the level of intoxication necessary to negate the specific intent of first-degree, malice aforethought murder is affected by PTSD." Id.

Petitioner's arguments fail to show that the OCCA acted unreasonably in denying him relief on this claim. Explanations for why Petitioner may have overreacted do not address the issue of whether he was incapable of forming specific intent. As such, it was not unreasonable for the OCCA to find no error in the first stage exclusion of the evidence. See United States v. Brown, 326 F.3d 1143, 1146-48 (10th Cir. 2003) (discussing the admissibility of mental health expert testimony to negate specific intent and finding that the district court did not err in excluding irrelevant PTSD evidence).[5] Moreover, regarding his

---

[5] In Brown, the Tenth Circuit held "that psychological or psychiatric evidence that negates the essential element of specific intent can be admissible." Brown, 326 F.3d at 1147 (footnote omitted). However, "[t]he admission of such evidence will depend upon whether the defendant clearly demonstrates how such evidence would negate intent rather than 'merely present a dangerously confusing theory of defense more akin to justification and excuse.'" Id. (quoting United

involuntary intoxication defense, Petitioner has not made any showing that his level of intoxication was affected by his PTSD. Dr. Massad gave no such testimony, but stated only that the ingestion of drugs and alcohol could increase the likelihood that Petitioner would overreact. Again, because there is nothing here to suggest that Petitioner's PTSD and substance abuse prevented him from forming specific intent, only that these circumstances may have caused him to overreact, the Court cannot find the OCCA's determination unreasonable. Petitioner's Ground 2 is therefore denied.

### C. Ground 3: Voluntary Intoxication Instruction.

In Ground 3, Petitioner asserts that he was denied a fair trial due to a faulty instruction regarding the jury's consideration of his voluntary intoxication defense. Petitioner additionally claims that this error was made worse by the prosecutor's closing argument. Petitioner raised this claim on direct appeal, and the OCCA denied relief. Respondent argues that relief must be denied because Petitioner has failed to show that the OCCA's decision is an unreasonable one.

"A habeas petitioner who seeks to overturn his conviction based on a claim of error in the jury instructions faces a significant burden." Ellis v. Hargett, 302 F.3d 1182, 1186 (10th Cir. 2002). "Unless the constitution mandates a jury instruction be given, a habeas petitioner must show that, in the context of the entire trial, the error in the instruction

_____

States v. Cameron, 907 F.2d 1051, 1067 (11th Cir. 1990)). See also United States v. Barrett, 797 F.3d 1207, 1216-17 (10th Cir. 2015) (relying on Brown to reject a claim of ineffective assistance of counsel for failing to present evidence of the defendant's mental defects which would not have shown the inability to form specific intent, but only "'what he perceived and what his (diminished) intent was in the midst of an unannounced raid led by an unmarked vehicle'").

was so fundamentally unfair as to deny the petitioner due process." <u>Tiger v. Workman</u>,

445 F.3d 1265, 1267 (10th Cir. 2006).

> It is well established that a criminal defendant has a due process right to a fair trial. <u>E.g.</u>, <u>Drope v. Missouri</u>, 420 U.S. 162, 172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). Further, the Supreme Court has acknowledged that an instructional error can, under certain circumstances, result in a violation of a defendant's right to a fair trial. <u>See</u> <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977); <u>Cupp v. Naughten</u>, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Importantly, however, the Court has stated that "[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." <u>Henderson</u>, 431 U.S. at 154, 97 S.Ct. 1730. "The question in such a collateral proceeding," the Court has stated, "is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," and "not merely whether the instruction is undesirable, erroneous, or even universally condemned . . . ." <u>Id.</u> (internal quotation marks and citations omitted).

<u>Cummings v. Sirmons</u>, 506 F.3d 1211, 1240 (10th Cir. 2007).

With respect to Petitioner's voluntary intoxication defense, the jury was instructed as

follows:

## INSTRUCTION NO. 30

## DEFENSE OF VOLUNTARY INTOXICATION –
## INTRODUCTION

Evidence has been introduced of intoxication of the defendant as a defense to the charge that the defendant has committed the crime in Count 1 of Murder In The First Degree and in Count 2 of Murder In The First Degree.

## INSTRUCTION NO. 31

## DEFENSE OF VOLUNTARY INTOXICATION –
## REQUIREMENTS

The crimes in Counts 1 and 2 of Murder In The First Degree have as an element the specific criminal intent of Malice Aforethought. A person is entitled to the defense of voluntary intoxication if that person was incapable of forming the specific criminal intent because of his intoxication.

## INSTRUCTION NO. 32

## DEFENSE OF VOLUNTARY INTOXICATION BY DRUGS
## OR ALCOHOL

The defense of intoxication can be established by proof of intoxication caused by drugs or alcohol.

## INSTRUCTION NO. 33

## DEFENSE OF VOLUNTARY INTOXICATION – BURDEN
## OF PROOF – COUNT 1

It is the burden of the State to prove beyond a reasonable doubt that the defendant formed the specific criminal intent of the crime in Count 1 of Murder In The First Degree. If you find that the State has failed to sustain that burden, by reason of the intoxication of Kendrick A. Simpson, then Kendrick A. Simpson must be found not guilty of Murder In The First Degree. You may find Kendrick A. Simpson guilty of Manslaughter In The First Degree, if the State has proved beyond a reasonable doubt each element of the crime of Manslaughter In The First Degree.

## INSTRUCTION NO. 34

## DEFENSE OF VOLUNTARY INTOXICATION – BURDEN
## OF PROOF – COUNT 2

It is the burden of the State to prove beyond a reasonable doubt that the defendant formed the specific criminal intent of the crime in Count 2 of Murder In The First Degree. If you find that the State has failed to sustain that burden, by reason of the intoxication of Kendrick A. Simpson, then Kendrick A. Simpson must be found not guilty of Murder In The First Degree. You may find Kendrick A. Simpson guilty of Manslaughter In The First Degree, if the State has proved beyond a reasonable doubt each element of the crime of Manslaughter In The First Degree.

## INSTRUCTION NO. 35

## DEFENSE OF VOLUNTARY INTOXICATION –
## DEFINITIONS

**Incapable Of Forming Specific Criminal Intent** – The state in which one's mental powers have been overcome through intoxication, rendering it impossible to form *a criminal intent*.

**Intoxication** – A state in which a person is so far under the influence of an intoxicating liquor or drug to such an extent that his judgment is impaired.

(O.R. III, 563-68) (emphasis added). Petitioner's sole complaint with these instructions is the first definition contained in the last instruction, Instruction No. 35. As *italicized* above, Petitioner's argument is that this single reference to *a criminal intent*, as opposed to specific criminal intent, "required the jury to determine [he] was unable to form ***any*** criminal intent before granting him use of the Voluntary Intoxication defense." Petition, p. 15.

In denying Petitioner relief on this claim, the OCCA looked at the instructions as a whole and determined that the "jury was adequately advised that malice aforethought was

the proper intent to apply to the voluntary intoxication defense." <u>Simpson</u>, 230 P.3d at 900.

A simple review of the instructions set forth above confirms the OCCA's conclusion. The

jury was clearly informed that Petitioner's murder counts required a finding that Petitioner

had the specific intent of malice aforethought and that if Petitioner's drug and alcohol

consumption rendered him incapable of forming this specific intent, he must be found not

guilty of the first degree murder counts. <u>See</u> <u>Cupp</u>, 414 U.S. at 146-47 (It is "well

established . . . that a single instruction to a jury may not be judged in artificial isolation, but

must be viewed in the context of the overall charge."). The OCCA's additional determination

that the prosecutor's comments "were largely correct and proper statements of the law" with

respect to the issue of intent (and Petitioner's voluntary intoxication defense) is a reasonable

one as well. <u>Simpson</u>, 230 P.3d at 900.[6] <u>See</u> <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637,

643 (1974) (The question is whether the prosecutor's actions or remarks "so infected the trial

with unfairness as to make the resulting conviction a denial of due process."). For the

foregoing reasons, the Court finds that Petitioner's Ground 3 falls far short of the sort of

"extreme malfunction" which this Court is empowered to correct. <u>Richter</u>, 562 U.S. at 102.

Relief is therefore denied.

---

[6] The OCCA found that although there were instances when the prosecutor made a general reference to criminal intent, the prosecutor also "argued to the jury, in the context of the voluntary intoxication defense, that the evidence show[ed] that [Petitioner] had the specific 'intent to kill' when he committed the crime." <u>Simpson</u>, 230 P.3d at 900.

### D.    Ground 4: Petitioner's Custody Status.

In Ground 4, Petitioner asserts that his constitutional rights were violated by references during trial to his custodial status. Petitioner presented this claim to the OCCA for the first time in his second post-conviction application, which was filed after the filing of his petition in this case. The OCCA declined to reach the merits of the claim, and Respondent urges this Court to apply a procedural bar.

When a state court applies a state procedural rule to preclude merits consideration of a claim, a federal habeas court will follow suit if the rule is one which "is independent of the federal question and adequate to support the judgment." Coleman, 501 U.S. at 729. "To be independent, the procedural ground must be based solely on state law." Thacker v. Workman, 678 F.3d 820, 835 (10th Cir. 2012) (citing English v. Cody, 146 F.3d 1257, 1259 (10th Cir. 1998)). "To be adequate, the procedural ground 'must be strictly or regularly followed and applied evenhandedly to all similar claims.'" Thacker, 678 F.3d at 835 (quoting Sherrill v. Hargett, 184 F.3d 1172, 1174 (10th Cir. 1999)).

In disposing of Petitioner's Ground 4, the OCCA held as follows:

> [Petitioner] claims that the trial court erred in announcing to the jury that the deputy was present in the courtroom because [Petitioner] was in custody and needed to be escorted to all of his court proceedings. This alleged error occurred at trial and as it is based neither on newly-discovered facts nor on new controlling legal authority, it is therefore barred from review in this post-conviction application. 22 O.S.Supp.2006, § 1089(D).

Simpson, No. PCD-2012-242, slip op. at 7. Although the Tenth Circuit has repeatedly recognized the OCCA's application of a procedural bar to claims which could have been

raised in an initial post-conviction application but were not,[7] its validity has been questioned

in recent years, as Petitioner has asserted in this case, based on the OCCA's decision in

Valdez v. State, 46 P.3d 703 (Okla. Crim. App. 2002), and subsequent cases in which the

OCCA has reached the merits of certain claims raised in subsequent post-conviction

applications. The Tenth Circuit has determined, however, that despite the OCCA's decision

in Valdez and its application of Valdez in post-conviction review, the procedural rule applied

by the OCCA to bar claims which could have been raised in a petitioner's first post-

conviction proceeding remains both adequate and independent. Fairchild v. Trammell,

784 F.3d 702, 719 (10th Cir. 2015) (acknowledging the independence of the rule), cert.

denied, 136 S. Ct. 835 (2016); Williams v. Trammell, 782 F.3d 1184, 1213-14 (10th Cir.

2015) (acknowledging the adequacy and independence of the rule), cert. denied, 136 S. Ct.

806 (2016); Black v. Tramwell [sic], 485 F. App'x 335, 335-37 (10th Cir. 2012) (rejecting

an independence challenge and reaffirming the adequacy of the rule after certification of a

question to the OCCA); Banks v. Workman, 692 F.3d 1133, 1144-47 (10th Cir. 2012)

(rejecting a challenge to the adequacy and independence of the rule); Black v. Workman,

682 F.3d 880, 914, 916-19 (10th Cir. 2012) (rejecting an adequacy challenge to the rule and

certifying a question to the OCCA regarding independence of the rule); Thacker, 678 F.3d

at 834-36 (finding the rule both independent and adequate); Spears v. Mullin, 343 F.3d 1215,

---

[7] See Bland, 459 F.3d at 1012; Medlock v. Ward, 200 F.3d 1314, 1323 (10th Cir. 2000); Smallwood v. Gibson, 191 F.3d 1257, 1267 (10th Cir. 1999); Moore v. Reynolds, 153 F.3d 1086, 1096-97 (10th Cir. 1998).

1254-55 (10th Cir. 2003) (addressing the adequacy of the rule). In light of this circuit precedent, the Court rejects Petitioner's challenge to the OCCA's application of Section 1089(D)(8) to bar merits review of his Ground 4.[8]

Because the OCCA's application of Section 1089(D)(8) is both adequate and independent, the Court cannot consider the merits of Petitioner's Ground 4 unless Petitioner can satisfy an exception. Petitioner may overcome the application of a procedural bar to this claim if he can show either cause and prejudice or a fundamental miscarriage of justice.[9] Coleman, 501 U.S. at 750. The cause and prejudice exception requires Petitioner to demonstrate that some external objective factor, unattributable to him, prevented his compliance with the procedural rule in question. Spears, 343 F.3d at 1255. He must also show that the failure resulted in actual prejudice. Thornburg, 422 F.3d at 1141.

In an effort to satisfy the cause and prejudice exception, Petitioner asserts that his default should be excused based on the ineffectiveness of his trial, appellate, and post-conviction counsel. Reply, p. 4. However, none of these assertions are sufficient to overcome the imposition of a procedural bar to his claim. Neither ineffective assistance of trial counsel nor ineffective assistance of appellate counsel explains Petitioner's failure to present his Ground 4 in his first post-conviction application. In addition, post-conviction

---

[8] In its adjudication of Petitioner's second post-conviction application, the OCCA specifically rejected Petitioner's request for relief under Valdez. Simpson, No. PCD-2012-242, slip op. at 3-4.

[9] Petitioner has not alleged the fundamental miscarriage of justice exception. See Reply, p. 4 (arguing only cause in an effort to overcome his procedural default of this ground).

counsel ineffectiveness cannot serve as cause. Coleman, 501 U.S. at 752 (because there is no constitutional right to representation in state post-conviction proceedings, a petitioner "'bear[s] the risk of attorney error that results in a procedural default'") (citation omitted); Spears, 343 F.3d at 1255 (citing 28 U.S.C. § 2254(i), Coleman, and Smallwood, 191 F.3d at 1269, for the proposition that "ineffective representation in state post-conviction proceedings is inadequate to excuse a procedural default"); Thomas v. Gibson, 218 F.3d 1213, 1222 (10th Cir. 2000) (relying on "well-established Supreme Court precedent" to reject an allegation of cause based upon post-conviction counsel's representation).[10] Because Petitioner has not demonstrated sufficient cause and prejudice to overcome the imposition of a procedural bar to his Ground 4, the Court concludes that it is procedurally barred.

### E. Ground 5: Firearm Demonstration.

In Ground 5, Petitioner complains about a firearm demonstration sponsored by the prosecution. On direct appeal, Petitioner argued that the trial court abused its discretion in permitting the demonstration because it was both misleading and prejudicial. Finding no error in the trial court's evidentiary ruling, the OCCA denied relief. Simpson, 230 P.3d at 897-98. Although Petitioner admits to some "reformulation" of the claim, he asserts that his Ground 5 is in essence the same claim he raised on direct appeal. Reply, pp. 4-5. Respondent asserts that to the extent Petitioner has recast his claim into a prosecutorial

---

[10] This remains unchanged by the Supreme Court's decisions in Trevino v. Thaler, 569 U.S. ___, 133 S. Ct. 1911 (2013), and Martinez v. Ryan, 566 U.S. ___, 132 S. Ct. 1309 (2012). Fairchild, 784 F.3d at 719-23; Banks, 692 F.3d at 1147-48.

misconduct claim, it is unexhausted and subject to an anticipatory procedural bar. Respondent additionally asserts that if the claim is construed to be the same claim raised on direct appeal, Petitioner is not entitled to relief because the OCCA's resolution of the claim is neither legally nor factually unreasonable.

Respondent cites <u>Bland</u> in support of his argument that the prosecutorial misconduct aspect of Petitioner's Ground 5 is unexhausted. In <u>Bland</u>, the Tenth Circuit discussed the exhaustion requirement as follows:

> A state prisoner generally must exhaust available state-court remedies before a federal court can consider a habeas corpus petition. <u>See</u> 28 U.S.C. § 2254(b)(1)(A); <u>Hawkins v. Mullin</u>, 291 F.3d 658, 668 (10th Cir.2002). A claim has been exhausted when it has been "fairly presented" to the state court. <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). "Fair presentation" requires more than presenting "all the facts necessary to support the federal claim" to the state court or articulating a "somewhat similar state-law claim." <u>Anderson v. Harless</u>, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982) (per curiam). "Fair presentation" means that the petitioner has raised the "substance" of the federal claim in state court. <u>Picard</u>, 404 U.S. at 278, 92 S.Ct. 509. The petitioner need not cite "'book and verse on the federal constitution,'" <u>id.</u> (quoting <u>Daugharty v. Gladden</u>, 257 F.2d 750, 758 (9th Cir.1958)), but the petitioner cannot assert entirely different arguments from those raised before the state court. For example, in <u>Hawkins</u>, 291 F.3d at 669, the defendant argued on direct appeal that the trial court erred in not considering whether he knowingly and voluntarily waived the opportunity to present mitigating evidence. In his request for federal habeas corpus relief, however, he argued that trial counsel was ineffective in failing to investigate possible mitigating evidence. <u>Id.</u> We held that he had failed to exhaust that claim because "[w]hile [the defendant's] state-court claims focused on the *trial court's* actions" his federal habeas claims "specifically challenge[d] only *defense counsel's* failings." <u>Id.</u> (emphasis added).

<u>Bland</u>, 459 F.3d at 1011. As in <u>Hawkins</u>, the Tenth Circuit in <u>Bland</u> found that a claim was unexhausted and procedurally barred because "[a] challenge to the actions of the prosecution

25

differs significantly from a challenge to the instructions given by the court." <u>Bland</u>, 459 F.3d at 1012.

As in <u>Bland</u>, the Court finds that to the extent Petitioner now alleges that the prosecutor used false or misleading evidence to obtain a conviction against him, this claim is unexhausted because it is significantly different from the claim he raised on direct appeal. A challenge to the prosecutor's conduct is clearly not the same as a challenge to the trial court's evidentiary ruling. If Petitioner were to return to state court to exhaust this claim, the OCCA would undoubtedly procedurally bar it due to Petitioner's failure to raise it on direct appeal or in either of his two prior applications for post-conviction relief. <u>See</u> Ground 4, <u>supra</u> (discussing the validity of the OCCA's waiver rule in successive applications for post-conviction relief).

As for the claim Petitioner raised on direct appeal, the Court finds that the OCCA reasonably determined the evidentiary issue. In denying Petitioner relief, the OCCA set forth the following analysis:

> During the first stage of trial, the State conducted a firearms demonstration in which the jury was transported to an Oklahoma City Police Department firing range and an investigator for the Oklahoma County District Attorney's Office, Gary Eastridge, demonstrated the use of an AK-style semi-automatic weapon. Defense counsel objected to this demonstration and his objection was overruled.[FN6] [Petitioner] complains in his fourth proposition that this ruling was in error. Again, the admissibility of evidence is within the discretion of the trial court, which will not be disturbed absent a clear showing of abuse, accompanied by prejudice to the accused. <u>Jackson</u>, 2006 OK CR 45, ¶ 48, 146 P.3d at 1165.

> FN6. The record is clear that while defense counsel objected to the demonstration, he did not object to the investigator's testimony.

Because the weapon used in the shooting was never recovered, it is not known whether it was a fully automatic or a semi-automatic firearm. [Petitioner] contends that the demonstration of a semi-automatic weapon mislead the jury to believe that he had used this type of weapon in the shooting and bolstered the State's assertion that he shot with the intent to kill as he would have had to purposefully pull the trigger of a semi-automatic weapon many times to discharge as many bullets as were reported to have been fired. Thus, he argues, this demonstration was misleading and prejudicial.

The investigator who performed the demonstration testified that when an AK–47 fully automatic rifle is used, a single pull of the trigger will fire the weapon until the trigger is released. He testified that when a semi-automatic weapon is used, each pull of the trigger fires a single shot. He demonstrated a quick, repeated firing of a semi-automatic assault rifle. The testimony and demonstration showed the jury that either weapon could have been used by [Petitioner]. Neither the investigator's testimony nor his demonstration misled the jury to believe that [Petitioner] used a semi-automatic rather than a fully-automatic weapon. The demonstration which showed that a semi-automatic weapon could have been used was relevant and its probative value was not substantially outweighed by the danger of unfair prejudice. 12 O.S.2001, §§ 2401, 2403. The trial court did not abuse its discretion in overruling [Petitioner's] objection to the demonstration.

Simpson, 898 P.3d at 897-98. Payne v. Tennessee, 501 U.S. 808, 825 (1991), provides that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." However, Petitioner has not shown that the OCCA's decision is contrary to or an unreasonable application of this high standard. Because the murder weapon could have been a semi-automatic weapon, it was not unreasonable for the OCCA to find that a demonstration on how a semi-automatic works was relevant evidence. Relief is therefore denied.

**F.     Ground 6:    Prosecutorial Misconduct.**

In Ground 6, Petitioner alleges that he was denied a fair trial due to comments made by the prosecutor during voir dire and in both first and second stage closing arguments. Petitioner raised this claim on direct appeal but was denied relief. <u>Simpson</u>, 230 P.3d at 899. Respondent makes two arguments in response to this ground. First, Respondent contends that two of the comments were not a part of Petitioner's direct appeal claim. Consequently, he argues that they are unexhausted and should be procedurally barred. Response, pp. 38-39. As to the remaining comments, Respondent additionally asserts that Petitioner should be denied relief because the OCCA's decision is not contrary to or an unreasonable application of Supreme Court law. Having reviewed Petitioner's direct appeal brief, the Court concludes that the entirety of Petitioner's Ground 6 was contained in his direct appeal claim. <u>See</u> Brief of Appellant, Case No. D-2007-1055, pp. 55, 59-60 (discussing the two comments Respondent argues were not presented on direct appeal). However, for the following reasons, the Court additionally concludes that Petitioner has not shown that he is entitled to relief under AEDPA deference.

Generally, allegations of prosecutorial misconduct are given due process review. <u>Stouffer v. Trammell</u>, 738 F.3d 1205, 1221 (10th Cir. 2013); <u>Hamilton v. Mullin</u>, 436 F.3d 1181, 1187 (10th Cir. 2006). The question is whether the prosecutor's actions or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Donnelly</u>, 416 U.S. at 643. A fundamental fairness inquiry "requires examination of the entire proceedings, including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase." <u>Le v.</u>

Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002). See also Coleman v. Brown, 802 F.2d 1227, 1237 (10th Cir. 1986) ("[T]o determine whether a state prosecutor's remarks were so flagrant as to deny a defendant a fair trial, we must take notice of all the surrounding circumstances, including the strength of the state's case."). "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." Bland, 459 F.3d at 1024.[11]

In denying Petitioner relief, the OCCA held as follows:

> In Proposition VI, [Petitioner] complains that prosecutorial misconduct deprived him of his right to a fair trial. "This Court will not grant relief based on prosecutorial misconduct unless the State's argument is so flagrant and that it so infected the defendant's trial that it was rendered fundamentally unfair." Williams v. State, 2008 OK CR 19, ¶ 124, 188 P.3d 208, 230. [Petitioner] concedes that all but one of the comments complained of were not met with objection at trial. We review the comments not objected to for plain error only. Matthews v. State, 2002 OK CR 16, ¶ 38, 45 P.3d 907, 920.

> The alleged instances of misconduct include allegations that the prosecutor argued facts not in evidence, engaged in unnecessary ridicule of [Petitioner], contrasted [Petitioner's] situation with that of the victims', appealed to justice and sympathy for the victims and their families and improperly shifted the burden of proof. Many of these comments, including the single comment met with objection, fell within the broad parameters of effective advocacy and do not constitute error. Martinez v. State, 1999 OK CR 33, ¶ 44, 984 P.2d 813, 825. We review those comments bordering upon impropriety within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel.

---

[11] A different standard applies when a petitioner asserts the denial of a specific constitutional right. "When specific guarantees of the Bill of Rights are involved, . . . special care [is taken] to assure that prosecutorial conduct in no way impermissibly infringes them." Donnelly, 416 U.S. at 643. "[A] claim that the misconduct effectively deprived the defendant of a specific constitutional right . . . may be the basis for habeas relief without proof that the entire proceeding was unfair." Paxton v. Ward, 199 F.3d 1197, 1217 (10th Cir. 1999).

> DeRosa v. State, 2004 OK CR 19, ¶ 53, 89 P.3d 1124, 1145. Given the magnitude of the State's evidence against [Petitioner] this Court finds that any inappropriate comments not objected to did not deprive [Petitioner] of a fair trial or affect the jury's finding of guilt or assessment of punishment. There was no plain error here.

Simpson, 230 P.3d at 899. Characterizing the OCCA's decision as a "cursory blanket holding," Petitioner complains that "it gave [his] claims short shrift," and he faults the OCCA for failing to address the challenged comments individually. Petition, pp. 30-31. Petitioner asserts that each of his seven complaints warrant relief independently, but he also argues their cumulative effect.

Despite Petitioner's criticisms of the OCCA's analysis, it is clear that the AEDPA does not require a state court to adjudicate claims in any particular format. In fact, the AEDPA does not even require the state court to set forth the reasoning behind its holding. Richter, 562 U.S. at 98. "When the state court does not explain its decision, the applicant must still show that 'there was no reasonable basis for the state court to deny relief.'" Fairchild, 784 F.3d at 711 (quoting Richter). Petitioner's need to know more does not make the OCCA's decision an unreasonable one. The OCCA reviewed Petitioner's complaints in the context of the entire trial and the presented evidence and found that it "did not deprive [Petitioner] of a fair trial or affect the jury's finding of guilt or assessment of punishment." Simpson, 230 P.3d at 899. To obtain relief here, Petitioner must show that *all* fairminded jurists would disagree with the OCCA's assessment. Frost v. Pryor, 749 F.3d 1212, 1225-26 (10th Cir. 2014) ("Under the test, if *all* fairminded jurists would agree the state court decision was incorrect, then it was unreasonable and the habeas corpus writ should be granted. If,

however, *some* fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied.") (emphasis added); <u>Stouffer</u>, 738 F.3d at 1221 (citing <u>Richter</u>, 562 U.S. at 101, for the proposition that relief is warranted "*only if all* 'fairminded jurists' would agree that the state court got it wrong") (emphasis added). This he has not done. Accordingly, relief on Ground 6 is denied.

### G. Ground 7: Second Stage Hearsay Evidence.

In his seventh ground for relief, Petitioner complains about the admission of hearsay evidence in the second stage, a claim he raised on direct appeal. Although the OCCA agreed with Petitioner that the evidence should not have been admitted, it found the error harmless beyond a reasonable doubt and denied relief. <u>Simpson</u>, 230 P.3d at 898. Petitioner challenges the OCCA's harmless error finding, but Respondent contends that relief must be denied because the standard for relief set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), has not been met.

In the second stage, Roy Collins, a jailhouse informant, testified about his interactions with Petitioner in the Oklahoma County Jail (J. Tr. VII, 31-32). In addition to telling Mr. Collins details about his crimes (J. Tr. VII, 42-44), Petitioner asked Mr. Collins about "taking care" of three witnesses for him. Mr. Collins testified that Petitioner asked him if he was connected enough to have one male witness killed and two other pregnant female witnesses beat up. The cost for these services was also discussed (J. Tr. VII, 44-46). From these interactions with Petitioner, Mr. Collins also told the jury that Petitioner "had no remorse . . . whatsoever," and that he "used to walk around and smile and laugh about it all

the time" (J. Tr. VII, 44, 47). Following this testimony, the State introduced five letters written by Mr. Collins regarding his contact with Petitioner and his offer to help the State with its case against Petitioner. These letters were admitted without objection and read to the jury by Mr. Collins (J. Tr. VII, 49-56; State's Exhibits 81-85).

As noted above, the OCCA agreed with Petitioner that Mr. Collins' letters should not have been admitted. Simpson, 230 P.3d at 898 ("The letters were hearsay for which no exception applied."). The OCCA denied relief, however, due to harmless error. The OCCA reasoned as follows:

> [T]he record reveals that Collins' testimony prior to the introduction of the letters provided the jury substantially the same information as was contained within the letters. Collins testified that [Petitioner] had confessed to committing the crime, had shown no remorse for his actions and had even laughed about the crime and wanted to kill and threaten potential witnesses. Thus, while the letters were inadmissible hearsay, the information contained therein was cumulative to properly admitted evidence. In light of Collins' admissible testimony, we find that the introduction of this inadmissible hearsay was harmless error.

Id. Contrary to the OCCA's finding, Petitioner contends that the evidence contained in the letters was not "substantially the same" as the testimony given by Mr. Collins. Specifically, Petitioner argues that the letters contained additional damaging information including Mr. Collins' fear that Petitioner might harm him for stealing Petitioner's witness list (J. Tr. VII, 52-53; State's Exhibit 83). Petitioner argues that "the clear implication from these hearsay statements was that the shooting incident was not just a one-time circumstance and that [Petitioner] was the kind of person who would not hesitate to kill if he considered it necessary to further his interests." Petition, p. 34. In addition, Petitioner argues the letters

contained insensitive statements about the victims' families. In discussing Petitioner's lack of remorse, Mr. Collins wrote of Petitioner's disbelief that the victims' families were crying because the victims were gang bangers, a life they chose for themselves (J. Tr. VII, 54-55; State's Exhibit 84).

Brecht applies to Petitioner's Ground 7. Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (the Brecht standard applies to Section 2254 cases regardless of whether the state court recognized the error and reviewed it under Chapman). Therefore, the question is whether the alleged error "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 631 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). "[A] 'substantial and injurious effect' exists when the court finds itself in 'grave doubt' about the effect of the error on the jury's verdict." Bland, 459 F.3d at 1009 (quoting O'Neal v. McAninch, 513 U.S. 432, 435 (1995)). "'Grave doubt' exists where the issue of harmlessness is 'so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error.'" Id. at 1009-10. Because a death sentence requires a unanimous verdict, the ultimate question is whether the court "harbor[s] a significant doubt" as to the effect of the evidence on at least one juror whose vote could have made the difference between life and death. Lockett v. Trammel [sic], 711 F.3d 1218, 1232 (10th Cir. 2013) (internal citations omitted).

The Court does not harbor a significant doubt that the admission of Mr. Collins' letters had a substantial and injurious effect on the jury's death verdicts. In his testimony, Mr. Collins discussed Petitioner's willingness to kill the star witness against him and harm

two other witnesses.  The additional information that Mr. Collins felt Petitioner might harm him as well was just more of the same.  As for the statements about the victims' families crying, these comments related to Petitioner's lack of remorse, about which Mr. Collins had already testified.  Accordingly, the Court agrees with the OCCA that the hearsay contained in the letters was cumulative and therefore harmless.

However, even beyond the cumulative nature of the hearsay evidence, a review of all of the evidence supporting Petitioner's death sentences provides additional support for a finding of harmless error.  First, the crimes committed and the circumstances surrounding their commission.[12]  Petitioner began the evening with an expectation of trouble when he took his AK-47 with him for an evening out–first to a party and then to a hip hop club where gang members were known to hang out.  At the club, Petitioner, described as wearing a red hat and having tattooed tear drops on his face, got into an argument with the victims over his hat, and he threatened to shoot them with his AK-47 (J. Tr. III, 19-20, 26-31, 154, 158, 172-74; J. Tr. IV, 10, 12-13, 16-17, 31-34; J. Tr. V, 32-34, 36-37, 56-60).  After a later failed attempt to make good with the victims, one that resulted in Petitioner being hit in the mouth by victim Glen Palmer, Petitioner left the club (J. Tr. III, 31-32, 84-85, 118-19; J. Tr. IV, 19-21; J. Tr. V, 41-44).  Although the matter appeared to be over, Petitioner got mad when he saw Mr. Palmer and the other two victims at a nearby convenience store shortly thereafter.  Directing the driver of the vehicle he occupied to follow Mr. Palmer's vehicle, Petitioner

---

[12]  First stage evidence was incorporated into the second stage (J. Tr. VII, 17).

pursued them for over three miles with his AK-47 in hand. Eventually coming along side them on a main city street, Petitioner plastered the driver's side of Mr. Palmer's moving vehicle with numerous bullets, killing Mr. Palmer and Anthony Jones, injuring London Johnson, and striking the front door of the home of Annie Emerson who was awake at 3 a.m. in anticipation of her daily prayer time. As he left the scene, Petitioner exclaimed, "I'm a monster. I'm a mother****ing monster. Bitches don't want to play with me" (J. Tr. III, 41-47, 49, 249-56; J. Tr. IV, 25, 27-29, 31, 35-46; J. Tr. V, 47-52, 60-66; State's Exhibits 1-2, 5, 21, and 32-33). These very facts overwhelmingly support the jury's findings of the great risk of death to more than one aggravator and the continuing threat aggravator. They show that Petitioner is a self-proclaimed force to be reckoned with and that his response to alleged wrongs committed against him will be excessive, deadly, and without concern for those who get in the way of his retaliation efforts.

Second, the additional evidence that Petitioner is a continuing threat. In addition to the evidence introduced through Mr. Collins, both of Petitioner's co-defendants testified that they had been threatened by Petitioner. Co-defendant Jonathan Dalton testified that Petitioner told him not to talk to the police. Specifically, Petitioner said, "B, if you say anything, I know where your mama stays, I know where your sister stays. I'm going to their front door with it" (J. Tr. IV, 46-47). After Petitioner met with police, Petitioner told Dalton that the police wanted to speak with him, too. At Petitioner's direction, Petitioner, Dalton, and Latango Robertson, the other co-defendant, got together and agreed to tell the police the same story, which included "[e]verything . . . but the shooting" (J. Tr. IV, 47-49; J. Tr. V, 74-

75). Robertson testified that Petitioner also threatened him when Petitioner asked him to retrieve his AK-47 from the trunk. When Robertson tried to talk Petitioner out of it, Petitioner told him, "Well, if I had [sic] to get it myself, there's going to be trouble" (J. Tr. V, 60-61, 75-76).

Third, evidence that Petitioner, at the age of sixteen, committed an armed robbery. The victim of the robbery, Hung Pham, testified and gave details about the crime. Mr. Pham, an electronics repairman, testified Petitioner came into his home at night under the guise of seeking his repair services. Petitioner put a gun to his face, called him a bitch, and beat him up. He then pulled him into a closet, had him kneel down, and demanded all his money. Mr. Pham gave Petitioner all the money in his wallet, about $140, but Petitioner believed Mr. Pham had more. Petitioner shot Mr. Pham from behind. Luckily, the bullet went through Mr. Pham's ear and not his head (J. Tr. VII, 92-104). In addition to satisfying the prior violent felony aggravator, this prior conviction was also more evidence that Petitioner is a continuing threat.

Finally, the satisfaction of yet another aggravating circumstance, the especially heinous, atrocious, or cruel murder of Mr. Palmer. The evidence showed that Mr. Palmer did survive the shooting for a period of time and that during that time he expressed his fear that Petitioner would come back to finish him off. Mr. Johnson testified that Mr. Palmer had trouble breathing and that it sounded like Mr. Palmer had blood in his throat (J. Tr. III, 42-43, 45-46). The medical examiner testified that Mr. Palmer died a result of a gunshot wound to the chest, and although Mr. Palmer would have needed immediate medical care to survive,

the medical examiner corroborated Mr. Johnson's testimony that Mr. Palmer could have lived for a short period of time after being shot (J. Tr. V, 161-63). See Ground 12, infra.

In response to this strong evidence supporting four aggravating circumstances, Petitioner did present mitigating circumstances, including his age, mental condition, and family support (O.R. III, 605). However, Petitioner's mitigation evidence was not enough to overcome the State's fortified second stage case.

Petitioner's first witness challenged Mr. Collins' credibility. Although he did so successfully,[13] his testimony countered only a small portion of the aggravating evidence the State presented.

Petitioner's grandmother, mother, and aunt also testified. Petitioner's grandmother, Marie Decoud, explained that because Petitioner was born to her daughter while she was still in high school, Ms. Decoud took care of him until his mother finished school. Ms. Decoud testified that Petitioner's father took no hand in raising him, and she described Petitioner as a "very good" child, noting that he was "[m]annerable" and "well raised." Ms. Decoud was the first witness to testify about Petitioner being "shot up" when he was in New Orleans. Petitioner was severely injured in this incident and was in a coma for three or more months. After his initial release, an infected gunshot wound caused Petitioner to undergo additional treatment and further hospitalization. Ms. Decoud testified that if the jury imposed a

---

[13] In closing argument, the State conceded that based on Evan Gatewood's testimony, it was clear that Mr. Collins had lied about playing football for the University of Oklahoma (J. Tr. VIII, 16, 19, 22).

sentence less than death, she would be supportive of and would visit Petitioner, as she did when he was previously incarcerated (J. Tr. VII, 140-44, 148). Through Ms. Decoud's testimony the jury was also advised that Petitioner did not graduate from high school, but only attended school through the eighth grade (J. Tr. VII, 146).[14]

Petitioner's mother, Barbara Mason, testified that she was sixteen years old when she had Petitioner. She acknowledged her mother's help with Petitioner, and she confirmed that Petitioner's father was not involved in their lives nor did he provide any support. Ms. Mason testified that Petitioner was a good child, that she "had no problem out of him," and that he was loved by his family. Ms. Mason also testified about Petitioner being shot in 2004, providing additional information that it was a drive-by shooting and that Petitioner was shot five times. Ms. Mason told the jury that Petitioner took responsibility for his crime against Mr. Pham. Like her mother, Ms. Mason concluded her testimony by saying that she would visit Petitioner in jail if he received an imprisonment sentence (J. Tr. VII, 151-55).

Although Petitioner's aunt, Chrisunda Thomas, described Petitioner as "a sweet kid" who "never gave any trouble," she acknowledged that Petitioner went to prison when he was sixteen and that she visited him in prison two to three times a month. Like her mother and her sister, Ms. Thomas discussed Petitioner being shot in November of 2004 and how critical his injuries were. After being shot, Petitioner became paranoid, afraid to even respond to someone knocking on the door, for fear that someone was returning to finish him off.

---

[14] Defense counsel noted in second stage opening statement that Petitioner's New Orleans school records were unobtainable due to Hurricane Katrina (J. Tr. VII, 12).

Ms. Thomas testified that she loved Petitioner and that she wished he was not in this situation. She testified that she would visit Petitioner in prison (J. Tr. VII, 199-206).

Dr. Massad testified regarding Petitioner's mental health. As previously discussed in connection with Petitioner's Ground 2, supra, Dr. Massad's psychological evaluation of Petitioner revealed that Petitioner "more likely than not" had PTSD (J. Tr. VII, 160-63). Dr. Massad explained that in order to be diagnosed with PTSD, "one has to have been exposed to a life-threatening trauma or serious illness and then satisfy different criteria that are key to that trauma." Petitioner's life-threatening trauma was being shot in a drive-by shooting (J. Tr. VII, 163). Dr. Massad testified that someone with PTSD "might be hypersensitive and overreact," "become hypervigilant," and "might have an exaggerated startle response" (J. Tr. VII, 166-67). He also testified that drugs or alcohol might "increase the likelihood that [someone with PTSD] would react or overreact" (J. Tr. VII, 167). It was Dr. Massad's opinion that Petitioner's criminal actions "might be consistent with somebody who has PTSD and is reacting to the present situation in a way as influenced by past history and what's already happened to them" (J. Tr. VII, 168). Dr. Massad told the jury that "there are a multitude of treatments for PTSD" and that Petitioner's PTSD could be managed or even cured (J. Tr. VII, 172).

Petitioner's final witness was a former girlfriend, De'Andrea Lagarde. In her limited testimony, she told the jury that she had known Petitioner for three or four years. She knew Petitioner when he got shot and together they left New Orleans to come to Oklahoma after Hurricane Katrina. Ms. Lagarde testified that she loves and cares about Petitioner and she

39

told the jury that she would visit him in prison if the jury spared him of a death sentence (J. Tr. VII, 217-20).

In light of all of the evidence presented in the second stage, the Court concludes that the hearsay contained in the letters was cumulative to the testimony given by Mr. Collins prior to their introduction, and because the aggravating circumstances so greatly outweighed the mitigating ones, the Court additionally concludes that the letters had little or no effect on the jury's sentencing determination, much less a substantial and injurious one. Accordingly, relief on Ground 7 is denied.

**H. Ground 8: Improper Vouching.**

In Ground 8, Petitioner asserts that the testimony given by a police detective in the second stage regarding Mr. Collins, the jailhouse informant, was improper vouching. Petitioner raised this claim on direct appeal. The OCCA addressed the merits of the claim and denied relief. Simpson, 230 P.3d at 901. Not surprisingly, the parties disagree as to the reasonableness of the OCCA's holding.

Immediately after Mr. Collins testified, the State presented Oklahoma City Police Detective John George. In a mere three pages of testimony, Detective George testified that Mr. Collins was consistent.

Q. And without going into the interview, was he consistent with you?

A. He was very consistent. I think he provided a whole lot more about his history that we never asked him, but the story about [Petitioner] and his involvement was pretty much the same story he told today.

(J. Tr. VII, 84). Detective George also testified that Mr. Collins was not given anything in exchange for his testimony, although Detective George believed he should have.

Q.    Did you give Roy Collins anything?

A.    We should have.

Q.    That's a, "No"?

A.    No, we didn't.

Q,    I mean - -

A.    He got absolutely nothing from us.

Q.    Should he have?

A.    I believe he should have. I think he was - - when we went to interview him he knew stuff that we didn't even know. I didn't know the witnesses were pregnant at prelim. I had no idea.

I mean, there was no doubt in my mind that [Petitioner] told him these things because he had details - -

(J. Tr. VII, 85). Detective George's answer was cutoff by a defense objection, which was overruled (J. Tr. VII, 86-87), and then the following concluding testimony was given:

Q.    So, I'm sorry, as I was saying, Roy Collins was consistent with the information you had, is that correct?

A.    Yes.

Q.    You weren't feeding Roy Collins information?

A.    No, sir.

Q.    And if I understand you, you owe Roy Collins, but you haven't given him anything?

A.    I feel like we do.

(J. Tr. VII, 87).

In denying Petitioner relief on this claim, the OCCA held as follows:

> Evidence is impermissible vouching only if the jury could reasonably believe that a witness is indicating a personal belief in another witness's credibility, "either through explicit personal assurances of the witness's veracity or by implicitly indicating that information not presented to the jury supports the witness's testimony." Warner v. State, 2006 OK CR 40, ¶ 24, 144 P.3d 838, 860. In the present case, Detective George neither gave explicit personal assurances of these witnesses' veracity nor did he implicitly indicate that information not presented at trial supported these witnesses' testimony.[15] Detective George did not improperly vouch for the credibility of other witnesses and the admission of his testimony was not an abuse of discretion.

Simpson, 230 P.3d at 901. Petitioner argues that this holding is an unreasonable determination of the facts, and that it is both contrary to and an unreasonable application of United States v. Young, 470 U.S. 1 (1985), and Lisenba v. California, 314 U.S. 219 (1941). As to the OCCA's factual determination, Petitioner has not shown that the OCCA's characterization of Detective George's testimony is unreasonable. For the following reasons, the Court additionally concludes that the OCCA's decision is not contrary to or an unreasonable application of Supreme Court law.

In Young, the Supreme Court reviewed a prosecutor's closing statement to determine if it amounted to plain error. Young, 470 U.S. at 6. In response to comments made by defense counsel in his closing argument, the prosecutor stated several times, without one

---

[15] On appeal, Petitioner claimed that Detective George also vouched for co-defendants Dalton and Robertson.

42

objection, that he personally believed that the defendant had committed fraud, and he went so far as to tell the jurors that if they found otherwise, they were not doing their job. Id. at 4-6. In its analysis, the Supreme Court stated as follows:

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

Id. at 18-19. The Court ultimately concluded that no plain error occurred because the prosecutor's comments "contained no suggestion that he was relying on information outside the evidence presented at trial" and the overwhelming evidence of the defendant's guilt. Id. at 19-20.

Unlike Young, Petitioner's complaint here does not relate to comments made by the prosecutor but by a witness. See Parker v. Scott, 394 F.3d 1302, 1310 (10th Cir. 2005) (acknowledging the absence of Supreme Court authority that "vouching testimony itself violates the Due Process Clause"); Washington v. Addison, No. 08-CV-481-TCK-PJC, 2012 WL 1081082, at *3 (N.D. Okla. Mar. 28, 2012) (citing Parker: "Significantly, no Supreme Court authority holds that improper vouching violates due process."). In addition, there is no indication that the testimony given by Detective George regarding Mr. Collins' credibility was based on any information not already before the jury. Detective George testified that Mr. Collins' testimony at trial regarding what Petitioner told him was consistent

with what Mr. Collins told him during a prior interview. He went on to say that he believed that Mr. Collins had received his information from Petitioner because he knew details that the police did not even know. One such detail was the fact that the two female witnesses that Petitioner wanted beaten up were pregnant at the time, a detail mentioned by Mr. Collins in his own testimony.

Petitioner also relies on <u>Lisenba</u> for relief. In <u>Lisenba</u>, the Supreme Court set forth the fundamental fairness standard of review for general due process violations:

> As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.

<u>Lisenba</u>, 314 U.S. at 236. <u>See</u> <u>Parker</u>, 394 F.3d at 1310-11 (discussing <u>Lisenba</u> and the fundamental fairness inquiry). As the Tenth Circuit has acknowledged, however, "it is not improper for a prosecutor to direct the jury's attention to evidence that tends to enhance or diminish a witness's credibility." <u>Thornburg</u>, 422 F.3d at 1132. In the present case, the prosecutor presented Detective George to enhance Mr. Collins' credibility through evidence that his testimony was consistent with what he told the police and that he knew things he could have only learned from Petitioner. As the prosecutor told the trial court in response to defense counsel's objection at trial, this evidence was presented to counter the implication raised by the defense on cross-examination that Mr. Collins could have obtained information about Petitioner's case from public records, especially given Mr. Collins' experience as a prison law clerk (J. Tr. VII, 62-63, 67-68, 70-71, 82-83, 86). Under these circumstances, and

44

given all of evidence presented in support of the four aggravating circumstances as noted in Ground 7, supra, the Court concludes that Petitioner was not denied a fundamentally fair trial on account of Detective George's testimony, and therefore the OCCA did not act unreasonably in denying him relief on this claim. Consequently, Ground 8 is denied.

## I. Ground 9: Exculpatory Evidence.

In Ground 9, Petitioner asserts that the prosecution withheld exculpatory evidence which could have been used to challenge the credibility of Mr. Collins. Petitioner raised this claim in his second post-conviction application, but the OCCA did not address its merits. Respondent argues for the application of a procedural bar, but Petitioner asserts that the merits of this claim should be addressed because the OCCA's procedural ruling is neither adequate nor independent. Petitioner additionally asserts that he can satisfy the cause and prejudice exception to the procedural bar because the prosecution suppressed the evidence (cause) and because the evidence is material (prejudice). For the reasons set forth below, the Court finds that Petitioner has failed to overcome the application of a procedural bar to his Ground 9. In addition, the Court finds that Petitioner's claim fails on the merits as well.

In disposing of Petitioner's claim, the OCCA held as follows:

> [Petitioner] first argues that he was denied his right to due process at trial in violation of Brady v. Maryland[FN1] and Napue v. Illinois[FN2] by the prosecutor's failure to disclose material evidence favorable to the defense. All of the evidence at issue concerns the credibility of State's witness, Roy Collins, who testified against [Petitioner] in the second stage of his trial. The alleged misconduct at issue occurred at trial and the legal basis for this claim was available at the time of [Petitioner's] direct appeal and his original

45

application for post-conviction relief. Additionally, the claim could have been presented previously as the factual basis for the claims was available and could have been ascertained through the exercise of reasonable diligence. See 22 O.S.Supp.2006, § 1089(D)(4)(b), (D)(8). The claim is waived.

FN1. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

FN2. 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

Simpson, No. PCD-2012-242, slip op. at 4. Petitioner's challenges to the adequacy and independence of Section 1089(D)(8) have already been addressed and rejected in the Court's adjudication of his Ground 4, supra. As for his assertion of cause, Petitioner simply contends that "suppression is 'cause' for any default." Reply, p. 12. However, Petitioner's argument, without more, is unavailing.

A Brady claim is subject to a procedural bar like any other claim, and the cause and prejudice exception requires Petitioner to demonstrate that some external objective factor, unattributable to him, prevented his compliance with the procedural rule in question. Spears, 343 F.3d at 1255. The State's actions may have in fact prohibited Petitioner from raising his Brady claim earlier, but this is a showing he must make. Petitioner must show that even if he had conducted a "'reasonable and diligent investigation,'" he could not have discovered the evidence earlier because it was "in the hands of the State." Strickler v. Greene, 527 U.S. 263, 287-88 (1999).

Petitioner asserts that the prosecutor possessed (and suppressed) the following material evidence: (1) a videotaped interview of Mr. Collins with reference to the Jason Whitecrow case; (2) Mr. Collins' court records detailing his eleven prior convictions; and

(3) Mr. Collins' records from the Oklahoma Department of Corrections. Petition, p. 41. Petitioner states that this is the suppressed material he knows of as of the time of filing his petition; however, makes no assertion that he found this information within the files of the Oklahoma County District Attorney's Office nor does he provide any explanation as to how he discovered it.[16] And, in addition to the three items listed above, Petitioner supports his Brady claim with reference to multiple exhibits, including letters from the University of Oklahoma and Oklahoma Panhandle State University regarding Mr. Collins' attendance; an affidavit from Barry Switzer, the head football coach at the University of Oklahoma from 1973 to 1988; a letter from a former girlfriend of Mr. Collins; affidavits from inmates who were incarcerated with Mr. Collins; and affidavits from businessmen concerning Mr. Collins' employment. It is apparent that Petitioner has been able to learn additional information about Mr. Collins through the investigative efforts of his habeas counsel, and although there is no doubt that Petitioner has uncovered information that challenges Mr. Collins' credibility, Petitioner fails to make any showing that he was prevented from discovering this information sooner. The OCCA determined that the "legal basis for this claim was available at the time of [Petitioner's] direct appeal and his original application for post-conviction relief," Simpson, No. PCD-2012-242, slip op. at 4, and Petitioner has not made any assertions that

---

[16] In his motion for discovery, by which he seeks to obtain all of the District Attorney's files relating to his case, Petitioner states only that he has discovered exculpatory evidence which the prosecution did not disclose. As in his petition, he offers no detail as to how he learned of this evidence. Doc. 42 at 3.

question this finding. For this reason, Petitioner has failed to demonstrate cause sufficient to overcome the imposition of a procedural bar to his Brady claim.

In addition to failing to show cause, Petitioner has also failed to show prejudice. When a Brady claim has been procedurally defaulted, the cause and prejudice exception dovetails with the Brady analysis, which requires a petitioner to show that the evidence was suppressed by the state and that "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Strickler, 527 U.S. at 281-82. Petitioner asserts that Mr. Collins' testimony "was critically important to prove continuing threat." Petition, p. 41 (internal quotation marks omitted).[17] However, as detailed in Ground 7, supra, Mr. Collins' testimony was not the only evidence of continuing threat, and in addition to the other evidence supporting continuing threat, there was an abundance of evidence supporting the three other aggravating circumstances. And even beyond this, much of the information Petitioner has "discovered" about Mr. Collins was known and explored at trial or is simply more of the same. On direct examination, the prosecutor elicited testimony from Mr. Collins regarding his prior convictions in Oklahoma, Texas, Colorado, and Florida, some of which involved dishonesty. Mr. Collins admitted that he was a liar and a drug abuser, and that while in prison, he worked "illegally" by charging

---

[17] Specifically, Petitioner states that "Collins was the sole witness to imply [Petitioner] had killed before, was remorseless and arrogant, and willing to contract with Collins to kill or threaten witnesses." Petition, p. 41. See also Petition, p. 52. While the Court agrees with Petitioner that Mr. Collins testified regarding Petitioner's lack of remorse and desire to harm the witnesses who would be testifying against him, the Court has been unable to find any implication that Mr. Collins made regarding Petitioner having killed before (and Petitioner has provided no citation to the record in support of this assertion).

fellow inmates for legal services (J. Tr. VII, 18-31, 38). Mr. Collins acknowledged that he was a "rat" and a "snitch" and that he had helped the State before in the Whitecrow case (J. Tr. VII, 32). On cross-examination, defense counsel questioned Mr. Collins further about his prior convictions, his motivation for testifying, and his assertion that he played football for the University of Oklahoma (J. Tr. VII, 59-80), and through additional testimony, proved that Mr. Collins had not played for the Sooners as he claimed. See Ground 7 & n.13, supra. In light of all of this evidence, the Court concludes that Petitioner has not shown a reasonable probability of another result had this evidence been made known to him. As the Supreme Court found in Strickler, even if Mr. Collins had been "severely impeached or excluded entirely," "[t]he record provides strong support for the conclusion that petitioner would have been convicted of capital murder and sentenced to death." Strickler, 527 U.S. at 294, 296. For these reasons, the Court concludes that Petitioner's Ground 9 is not only procedurally barred but subject to denial on the merits as well.[18]

> **J.      Ground 10:  Mitigation Limitation.**

In Ground 10, Petitioner argues that he was denied his right to present mitigating evidence. Specifically, Petitioner asserts that the trial court erred when it limited the testimony of his last witness. Petitioner raised this claim in his first post-conviction application. The OCCA found the claim waived because it could have been presented on

---

[18] This includes Petitioner's additional claim under Napue. In addition to being procedurally barred, Petitioner has not shown that the prosecution knowingly presented false testimony or permitted false testimony to go uncorrected. See Napue, 360 U.S. at 269. In fact, the record is clear that when defense counsel did catch Mr. Collins in a lie, the prosecutor readily acknowledged the same before the jury. See n.13, supra.

direct appeal.  Simpson, No. PCD-2007-1262, slip op. at 7.  The OCCA additionally found that appellate counsel was not ineffective for failing to raise the claim.  Id. at 8. Consequently, Respondent asserts that the claim is procedurally barred.  Petitioner argues that the waiver applied by the OCCA is neither adequate nor independent, that appellate counsel ineffectiveness satisfies cause, and that a fundamental miscarriage of justice will occur if the Court fails to address the merits of the claim.

The record reflects that prior to defense witness De'Andrea Lagarde taking the stand, the prosecutor asked to approach the bench with defense counsel.  The prosecutor began by saying, "Judge, at some point there's a cumulative objection in here" (J. Tr. VII, 214).  When defense counsel replied that Ms. Lagarde was his last witness, the trial court inquired as to what her testimony would be (J. Tr. VII, 215).  Defense counsel responded as follows:

> She met him a few months after he got out of the penitentiary, known him about four years.  They were together when he got shot.  She can testify to the same stuff in the hospital, although, I wasn't necessarily going to go into that because that's pretty well established.

> She was with him the day the hurricane hit.  I was going to have her talk about what their experiences were in getting out of New Orleans.  She was with him in Norman before this incident.  Just not very long.

(J. Tr. VII, 215).  The trial court directed defense counsel not to question Ms. Lagarde about Petitioner's being shot because it was cumulative.  When defense counsel stated that he wanted to ask Ms. Lagarde about the effects of Hurricane Katrina like Dr. Massad had testified to, the trial court stated that the witness was not qualified to give that testimony. The trial court concluded by saying that "she can talk about whether she cares about him and

will she visit him in prison and all of that" (J. Tr. VII, 216). Ms. Lagarde then gave brief testimony that she had know Petitioner for three or four years, that he had been her boyfriend, that she knew him when he was in and out of the hospital, that they left New Orleans together, that she still loves and cares for him, and that she would go see him in prison if the jury gave him an imprisonment sentence (J. Tr. VII, 217-18).

Petitioner argued in his first post-conviction application that the trial court erred in limiting Ms. Lagarde's testimony. With reference to an affidavit provided by Ms. Lagarde on direct appeal (in support of a Rule 3.11 motion concerning trial counsel's ineffectiveness), Petitioner set forth the testimony Ms. Lagarde could have given. The testimony concerned the conditions she and Petitioner faced when Hurricane Katrina hit and how they made their way out of New Orleans.[19] Original Application for Post Conviction Relief, Case No. PCD-2007-1262, pp. 33-34. As noted above, the OCCA found that because this claim was contained in the trial record, appellate counsel could have raised it on direct appeal. Simpson, No. PCD-2007-1262, slip op. at 7. However, because Petitioner also argued that his appellate counsel was ineffective for failing to raise the claim, the OCCA additionally addressed and denied the merits of this related claim:

> While we find that appellate counsel could have raised these issues on direct appeal, failure to do so did not render counsels' performance deficient. "Appellate counsel is not required to raise every non-frivolous issue."

---

[19] Petitioner has since obtained another affidavit from Ms. Lagarde (Petitioner's Exhibit 41) in which Ms. Lagarde provides additional information beyond her Hurricane Katrina experiences with Petitioner. However, as Respondent aptly notes, this affidavit was not presented to the OCCA in its adjudication of the claim in his first post-conviction application. Response, pp. 65-66. Therefore, the Court cannot consider it. Pinholster, 563 U.S. at 181-82.

> Harris v. State, 2007 OK CR 32, ¶ 5, 167 P.3d 438, 442. Further, even if we were to find counsels' performance deficient, [Petitioner] has not shown a reasonable probability that but for this deficient performance, the result of the trial and sentencing proceedings would have been different. [Petitioner's] argument fails under the Strickland[20] test.

Simpson, No. PCD-2007-1262, slip op. at 8.

Although Petitioner asserts that "[t]he OCCA's adjudication of waiver is neither adequate nor independent," Petitioner offers no further support for this assertion. Reply, p. 13. The Court acknowledges that Petitioner has, in his Procedural Default Statement, challenged the validity of the OCCA's procedural rules with respect to certain trial counsel ineffectiveness claims and in light of Valdez. Petition, pp. 99-100. But because Ground 10 is not an ineffective assistance of trial counsel claim and because Petitioner's Valdez-based challenge has already been addressed by the Court in Ground 4, supra, the Court finds that Petitioner's challenge here also fails. The Court also concludes that Petitioner's attempt to satisfy the fundamental miscarriage of justice exception with a skeletal, conclusory statement that a miscarriage of justice will occur if this Court declines to hear his Ground 10 falls woefully short of meeting his pleading burden. Petition, p. 59. What remains then is Petitioner's allegation of cause–ineffective assistance of appellate counsel. However, because the OCCA addressed the merits of Petitioner's stated cause, AEDPA deference applies, and Petitioner has not shown that the OCCA acted unreasonably in finding that his appellate counsel was not ineffective for failing to raise this claim. Ryder ex rel. Ryder v.

---

[20] Strickland v. Washington, 466 U.S. 668 (1984).

Warrior, 810 F.3d 724, 746 (10th Cir. 2016); Turrentine v. Mullin, 390 F.3d 1181, 1202 (10th Cir. 2004). Therefore, the Court concludes that Petitioner's Ground 10 is procedurally barred.

### K.  Ground 11:  Mitigating Circumstances Instruction.

In Ground 11, Petitioner asserts that a uniform jury instruction, coupled with argument from the prosecutors, prevented the jury from considering his mitigating evidence. Petitioner raised this claim on direct appeal but was denied relief.  Simpson, 230 P.3d at 903-04. Respondent asserts that Petitioner has failed to demonstrate that the rejection of this claim by the OCCA is contrary to or an unreasonable application of Supreme Court law. The Court agrees.

Petitioner's complaint lies with Instruction No. 13, which in pertinent part, informed the jury that "[m]itigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame" (O.R. III, 604). Petitioner asserts that this instruction, along with arguments made by the prosecutors challenging the mitigating circumstances he put forth, violated Lockett v. Ohio, 438 U.S. 586 (1978), wherein the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  Lockett, 438 U.S. at 604 (footnotes omitted).

In support of his argument, Petitioner directs the Court's attention to the OCCA's decision in Harris v. State, 164 P.3d 1103 (Okla. Crim. App. 2007). In Harris, the OCCA addressed the same issue raised in Petitioner's case, and while the OCCA rejected the argument that "the current uniform jury instruction prohibits jurors from considering mitigating evidence[,]" Harris, 164 P.3d at 1113,[21] it nevertheless acknowledged that there had been instances where prosecutors had played upon the language of the instruction in an attempt to limit a jury's consideration of a defendant's mitigating evidence. Even though the OCCA did not grant relief to Harris, it did, in an effort to "clarify" the instruction and to "discourage improper argument[,]" determine that the instruction should be amended.[22] Id. at 1114. Petitioner requests relief because he "did not receive the benefit of this clarified instruction." Petition, p. 62.

In denying Petitioner relief on this claim, the OCCA specifically acknowledged Harris, but determined as it did in Harris, that relief was unwarranted. In particular, the OCCA held:

> A review of the prosecutor's closing argument concerning the mitigating evidence instruction, the mitigating evidence itself and all instructions concerning mitigating evidence given in this case supports our conclusion that

---

[21] The OCCA "emphasize[d] that the language of the current instruction itself is not legally inaccurate, inadequate, or unconstitutional." Harris, 164 P.3d at 1114.

[22] Thereafter, and in accordance with the language proposed in Harris, 164 P.3d at 1114, the instruction, OUJI-CR (2d) 4-78, was amended in pertinent part as follows: "Mitigating circumstances are 1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty."

> the jurors' consideration of the evidence offered in mitigation was not unfairly limited in this case.

Simpson, 230 P.3d at 904.  The Court concludes that Petitioner has failed to show that this decision by the OCCA is contrary to or an unreasonable application of Lockett.  In so concluding, the Court notes that the Tenth Circuit has recently addressed this very same issue in Hanson v. Sherrod, 797 F.3d 810, 849-52 (10th Cir. 2015), and likewise denied relief. Ground 11 is therefore denied.

## L. Ground 12: Insufficient Evidence of the HAC Aggravator.

In Ground 12, Petitioner challenges the evidence supporting the jury's finding of the especially heinous, atrocious, or cruel aggravator with respect to the murder of Mr. Palmer. The OCCA addressed this claim on direct appeal and denied relief.  Simpson, 230 P.3d at 902-03.  Petitioner is not entitled to relief on this claim because he has failed to show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.

When reviewing the sufficiency of evidence supporting an aggravating circumstance, the OCCA applies the standard of review set forth in Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Thus, the OCCA "'reviews the evidence in the light most favorable to the State to determine if any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt.'"  Simpson, 230 P.3d at 902 (quoting Washington v. State, 989 P.3d 960, 974 (Okla. Crim. App. 1999)).  Jackson applies on habeas review as well. Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  "Like findings of fact, state court findings of aggravating circumstances often require a sentencer to 'resolve conflicts in the testimony,

to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" Id. at 782 (quoting Jackson, 443 U.S. at 319). Thus, the Court "'must accept the jury's determination as long as it is within the bounds of reason.'" Lockett, 711 F.3d at 1243 (quoting Boltz v. Mullin, 415 F.3d 1215, 1232 (10th Cir. 2005)). In addition to the deference afforded a jury's verdict, the AEDPA adds another layer of deference to the Court's review of a sufficiency claim. See Hooks v. Workman, 689 F.3d 1148, 1166 (10th Cir. 2012) ("We call this standard of review 'deference squared.'") (citation omitted). When reviewing the evidentiary sufficiency of an aggravating circumstance under Jackson, the Court looks to Oklahoma substantive law to determine its defined application. Hamilton, 436 F.3d at 1194.

In denying Petitioner relief, the OCCA held as follows:

> To prove that a murder is especially heinous, atrocious or cruel, the evidence must show that the victim's death was preceded by torture or serious physical abuse. Hogan v. State, 2006 OK CR 19, ¶ 66, 139 P.3d 907, 931. Serious physical abuse is proved by showing that the victim endured conscious physical suffering before dying. Id.
>
> . . . .
>
> With regard to the murder of Glen Palmer, the evidence showed that Palmer was shot four times. He suffered a grazing gunshot wound to the right shoulder, two superficial gunshot wounds to the left side of his back, and an ultimately fatal gunshot wound to his chest. Although he was initially conscious after being shot, his breathing became labored and he made gurgling sounds as his chest filled with blood before he died. There was testimony that immediately after he had been shot, Palmer was able to speak, was aware that he had been shot and was fearful that the shooters would return. Reviewing the evidence in the light most favorable to the State, we find that the evidence supports a finding that Palmer's death was preceded by physical suffering and mental cruelty.

Simpson, 230 P.3d at 902 (citation omitted). Petitioner has not shown that this determination is an unreasonable one, especially in light of the double deference afforded it. Accordingly, relief is denied on Ground 12.

### M.    Ground 13:  Conflict of Interest.

In Ground 13, Petitioner alleges that he was denied the effective assistance of counsel because an investigator who worked on his case had previously worked on co-defendant Dalton's case.  Alleging this created an actual conflict of interest, Petitioner contends that he is entitled to relief without a showing of prejudice in accordance with the Supreme Court's decisions in Glasser v. United States, 315 U.S. 60 (1942), Holloway v. Arkansas, 435 U.S. 475 (1978), and Cuyler v. Sullivan, 446 U.S. 335 (1980).  Petitioner raised this claim on direct appeal, but was denied relief in a decision which Petitioner argues is both legally and factually unreasonable. Respondent asserts that AEDPA deference demands relief be denied.

In Glasser, 315 U.S. at 70, the Supreme Court held "that the 'Assistance of Counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests."  In Holloway, the Supreme Court addressed the issue of prejudice. From its opinion in Glasser, the Court found that "whenever a trial court improperly requires joint representation over timely objection reversal is automatic." Holloway, 435 U.S. at 488. Finally, in Cuyler, 446 U.S. at 350, the Supreme Court held "that the possibility of conflict is insufficient to impugn a criminal conviction.  In order to demonstrate a violation of his

Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance."

On direct appeal, Petitioner argued "that his trial counsel was ineffective for failing to adequately investigate, present, or otherwise deal with evidence in four critical areas . . . ." Brief of Appellant, Case No. D-2007-1055, p. 94. One of these four critical areas was evidence that his investigator had a conflict of interest. Id. at 98-99. Petitioner made additional argument in support of this claim in his Rule 3.11 motion for an evidentiary hearing. Application for an Evidentiary Hearing, Case No. D-2007-1055, pp. 15-18. Attached to the motion were affidavits from both of his trial attorneys and the investigator. These affidavits have been reproduced by Petitioner in his Exhibits 42, 79, and 80. Both of Petitioner's trial attorneys deny having any knowledge that the investigator, Chuck Loughlin, "had been involved in this case in any capacity prior to his assignment to represent [Petitioner]." Petitioner's Exhibits 79 and 80. Additionally, one states that he

> cannot think of a time when Mr. Loughlin made any overt attempt to steer our investigation away from matters potentially damaging to Dalton, or to protect Dalton in any way. Mr. Loughlin always acted as if he was completely loyal

to [Petitioner] and worked hard on this case.  This situation could be nothing more than an accidental breakdown in communications . . . .

Petitioner's Exhibit 79.  While the other states that he

> cannot think of any time when Mr. Loughlin made any attempt to shield Dalton from attacks or inquiries by [Petitioner's] defense team, or to steer our investigation away from matters potentially damaging to Dalton.  Mr. Loughlin always appeared to be loyal to [Petitioner] and worked hard on his case.  This situation could be inadvertent . . . .

Petitioner's Exhibit 80.  Mr. Loughlin states in his affidavit that he told both Petitioner and his lead counsel of his previous involvement with Dalton, and he describes his contact with Dalton as follows:

> I met with Dalton in the jail a couple of times, and I worked on gathering some records for him to use in mitigation.  I do not recall discussing first stage issues with him.  I am not sure how long I was assigned to his case.

Petitioner's Exhibit 42.  Mr. Loughlin states that he did not hold back from Petitioner's counsel any memorandums he generated for Dalton, and in fact, he does not even recall that he wrote any.  Id.  Mr. Loughlin additionally states that he "did the best [he] could possibly do for [Petitioner], and [does] not feel like [his] work on [Petitioner's] case was compromised in any way by the fact [he] previously was assigned to Jonathan Dalton's case." Id.

In addressing Petitioner's claim, the OCCA held as follows:

> Finally, [Petitioner] contends that the defense investigator who was assigned to work on his case had previously worked on co-defendant Dalton's case and therefore, had a conflict of interest. It is not clear how the investigator's alleged conflict of interest rendered trial counsel's performance deficient. The investigator's affidavit submitted in support of the Motion for an Evidentiary Hearing sheds no light on this. The investigator stated in his affidavit that he worked on gathering records for Dalton to use for mitigation and the memorandums he prepared for Dalton's case were turned over to

[Petitioner's] attorneys in this case. He also stated that he did the best that he could for [Petitioner] and did not feel like the work he did on [Petitioner's] case was compromised by his work on Dalton's case. [Petitioner] has neither shown that counsel were deficient with regard to their use of the investigator nor that any alleged deficiency prejudiced the defense, depriving [Petitioner] of a fair trial with a reliable result. [Petitioner] has not shown that he was denied his constitutional right to the effective assistance of counsel.

Simpson, 230 P.3d at 905. With respect to Petitioner's Rule 3.11 motion, the OCCA offered

the following additional analysis:

We have thoroughly reviewed [Petitioner's] application and affidavits along with other attached non-record evidence and we conclude that [Petitioner] has failed to show with clear and convincing evidence a strong possibility that counsel was ineffective for failing to identify or use the evidence raised in the motion. Consequently, we also find that [Petitioner] failed to show that counsel's performance was constitutionally deficient and that counsel's performance prejudiced the defense, depriving him of a fair trial with a reliable result. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d 674 (1984); Davis, 2005 OK CR 21, ¶ 7, 123 P.3d at 246. [Petitioner] is not entitled to an evidentiary hearing on his claim of ineffective assistance of counsel.

Id. at 906.

Petitioner's legal challenge to the OCCA's decision is its application of Strickland as

opposed to Holloway. Petitioner argues that although Holloway (and Glasser and Cuyler)

involved conflicted attorneys, the holdings of these cases are "so fundamental" that they

apply "'beyond doubt'" to his investigator. Petition, p. 65 (quoting Yarborough v. Alvarado,

541 U.S. 652, 666 (2004)). In Yarborough, the Supreme Court stated that

Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law. At the same time, the difference between applying a rule and extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.

Id. at 666 (citation omitted).  However, the Court is unconvinced by Petitioner's argument

for Holloway's application.  There is a distinct difference between one attorney representing

co-defendants and Petitioner using an investigator who had previously done some mitigation

work for one of his co-defendants.  See Reply, p. 18 n.3 (wherein Petitioner acknowledges

that "Loughlin's investigation . . . did not appear to have included first stage issues.").  As

the Tenth Circuit noted in Fairchild,

> "[T]he phrase 'clearly established Federal law, as determined by the Supreme
> Court of the United States'. . . refers to the holdings, as opposed to the dicta,
> of th[e] Court's decisions. . . ." Williams v. Taylor (Terry Williams), 529 U.S.
> 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Federal courts may not
> "extract clearly established law from the general legal principles developed in
> factually distinct contexts," House v. Hatch, 527 F.3d 1010, 1017 n. 5 (10th
> Cir.2008), and Supreme Court holdings "must be construed narrowly and
> consist only of something akin to on-point holdings," id. at 1015; see id. at
> 1016–17.

Fairchild, 784 F.3d at 710.  Consequently, the Court cannot fault the OCCA for conducting

its analysis under Strickland and denying relief due to the absence of both deficient

performance and prejudice, especially under the double deference the AEDPA affords

ineffectiveness claims.  See Jackson v. Warrior, 805 F.3d 940, 954 (10th Cir. 2015) ("Given

that the standards of review under both Strickland and AEDPA are 'highly deferential,'

habeas review of ineffective assistance claims is 'doubly so.'") (quoting Richter, 562 U.S.

at 105).

The Court additionally finds that Petitioner is not entitled to relief based upon his

allegation that the OCCA neglected and/or misrepresented facts.  The OCCA's failure to

mention Mr. Loughlin's few meetings with Dalton does not mean that this fact was not

considered. The OCCA did not find the absence of personal meetings, and it specifically stated that it had "thoroughly reviewed [Petitioner's] . . . affidavits." Simpson, 230 P.3d at 906. Regarding the OCCA's statement that Mr. Loughlin turned over the memorandums he prepared for Dalton, Petitioner is correct that this is a misstatement because although Mr. Loughlin stated he did not hold any memorandums back, he further stated that he did not remember preparing any. Nevertheless, it is clear that the OCCA's decision "was not based on" this determination. See 28 U.S.C. § 2254 (d)(2). In essence, the OCCA found that anything Mr. Loughlin had, he turned over. If he had nothing, he had nothing to turn over. See Hancock v. Trammell, 798 F.3d 1002, 1012 (10th Cir. 2015) ("We can reach the merits of the constitutional claim only if [petitioner] showed that the OCCA rested its decision on a factually mistaken view of the record.").

For the reasons set forth above, the Court finds that Petitioner is not entitled to relief on his Ground 13. Relief is therefore denied.

### N. Ground 14: Ineffective Assistance of Trial Counsel.

In Ground 14, Petitioner presents a myriad of reasons why his trial counsel was ineffective. Petitioner breaks his extensive ground for relief into three subparts: failure to investigate and present mitigation evidence (three claims), other evidentiary failures (five claims), and failing to preserve the record (eleven claims). Addressing each claim in turn, the Court finds that none of Petitioner's allegations warrant habeas relief.

**Mitigation Evidence**

Petitioner's initial complaint against his trial counsel is the failure to investigate, prepare, and present lay witnesses. Petition, pp. 68-71. Petitioner presented this claim on direct appeal. In his brief and accompanying Rule 3.11 motion, Petitioner argued that in contrast to the evidence which was presented at trial, he "did not come from a happy single-parent home, but grew up surrounded by violence, drugs, and poverty, which included family violence and a mother addicted to drugs." Brief of Appellant, Case No. D-2007-1055, p. 96. In his Rule 3.11 motion, Petitioner expanded upon his argument by referencing nine included affidavits. These affidavits correlate to Petitioner's Exhibits 40 and 45 through 52. Of the nine affidavits, six were from family members (three of whom testified at trial), two were from former girlfriends (one of whom testified at trial), and one was from a clinical psychologist, Dr. Jeri Fritz. The OCCA reviewed Petitioner's claim and the affidavits he provided in support. The OCCA's analyzed the claim as follows:

> In conjunction with this claim, [Petitioner] has filed a Rule 3.11 motion for an evidentiary hearing on the issue of ineffective assistance of counsel asserting that counsel was ineffective for failing to adequately investigate and identify evidence which could have been made available during the trial. Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2007). In accordance with the rules of this Court, [Petitioner] has properly submitted with his motion affidavits supporting his allegations of ineffective assistance of counsel. Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2007). As the rules specifically allow [Petitioner] to predicate his claim on allegations "arising from the record or outside the record or a combination of both," id., it is, of course, incumbent upon this Court, to thoroughly review and consider [Petitioner's] application and affidavits along with other attached non-record evidence to determine the merits of [Petitioner's] ineffective assistance of counsel claim. Our rules require us to do so in order to evaluate whether [Petitioner] has provided sufficient information to show this Court by clear and convincing evidence that there is a strong possibility trial counsel was

ineffective for failing to utilize or identify the evidence at issue. Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2007). This standard is intended to be less demanding than the test imposed by Strickland and we believe that this intent is realized. Indeed, it is less of a burden to show, even by clear and convincing evidence, merely *a strong possibility* that counsel was ineffective than to show, by a preponderance of the evidence that counsel's performance actually was deficient and that but for the unprofessional errors, the result of the proceeding would have been different as is required by Strickland. Thus, when we review and grant a request for an evidentiary hearing on a claim of ineffective assistance under the standard set forth in Rule 3.11, we do not make the adjudication that defense counsel actually was ineffective. We merely find that [Petitioner] has shown a strong possibility that counsel was ineffective and should be afforded further opportunity to present evidence in support of his claim. However, when we review and deny a request for an evidentiary hearing on a claim of ineffective assistance under the standard set forth in Rule 3.11, we necessarily make the adjudication that [Petitioner] has not shown defense counsel to be ineffective under the more rigorous federal standard set forth in Strickland.

In the present case, [Petitioner] specifically asserts in his application for an evidentiary hearing on his claim of ineffective assistance of counsel that defense counsel was ineffective for failing to investigate and present (1) additional mitigating evidence that [Petitioner] endured a miserable life of poverty and parental neglect during his childhood and adolescence . . . . We have thoroughly reviewed [Petitioner's] application and affidavits along with other attached non-record evidence and we conclude that [Petitioner] has failed to show with clear and convincing evidence a strong possibility that counsel was ineffective for failing to identify or use the evidence raised in the motion. Consequently, we also find that [Petitioner] failed to show that counsel's performance was constitutionally deficient and that counsel's performance prejudiced the defense, depriving him of a fair trial with a reliable result. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d 674 (1984); Davis, 2005 OK CR 21, ¶ 7, 123 P.3d at 246. [Petitioner] is not entitled to an evidentiary hearing on his claim of ineffective assistance of counsel.

Simpson, 230 P.3d at 905-06.

Petitioner argues that this decision by the OCCA is unreasonable, but in so doing, he

references three additional affidavits presented in his first application for post-conviction

relief, Petitioner's Exhibits 53, 54 and 82, and eighteen more affidavits presented in his second application for post-conviction relief, Petitioner's Exhibits 41, 55 through 69, 83, and 84. These affidavits were presented in support of expanded claims that his trial counsel was ineffective for failing to investigate and present mitigation evidence. The OCCA found that Petitioner waived these expanded claims by failing to include them on direct appeal and/or present them in his first application for post-conviction relief. Simpson, No. PCD-2012-242, slip op. at 5; Simpson, No. PCD-2007-1262, slip op. at 5-6. In accordance with Pinholster, these twenty-one additional affidavits, which were not before the OCCA when it addressed the merits of the claim on direct appeal, cannot be considered by the Court in determination of Petitioner's request for habeas relief. Pinholster, 563 U.S. at 181 (review under Section 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits").

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." Burt v. Titlow, 571 U.S.___, 134 S. Ct. 10, 18 (2013). Whether counsel has provided constitutional assistance is a question to be reviewed under the familiar standard set forth in Strickland, which the OCCA did in denying Petitioner relief. To obtain relief, Strickland requires a defendant to show not only that his counsel performed deficiently, but that he was prejudiced by it. Strickland, 466 U.S. at 687. A defendant must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Id. The assessment of counsel's conduct is "highly deferential," and a defendant must overcome the strong

presumption that counsel's actions constituted "'sound trial strategy.'" Id. at 689 (citation omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." Id. at 690.

As Strickland cautions, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. Therefore, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. Within "the wide range of reasonable professional assistance," "[t]here are countless ways to provide effective assistance in any given case[, and] [e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id.

As for prejudice, Strickland requires a defendant to show that his counsel's errors and omissions resulted in actual prejudice to him. Id. at 687. In order to make a threshold showing of actual prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Where, as here, the claim is the omission of mitigating evidence, the proper assessment of actual prejudice includes consideration of all of the mitigating and aggravating evidence. This includes not only the aggravating and mitigating evidence

presented at trial in light of the omitted mitigation evidence which a defendant asserts should have been admitted, "but also what the prosecution's response to that evidence would have been." Wilson v. Trammell, 706 F.3d 1286, 1305-06 (10th Cir. 2013) (discussing the application of Wong v. Belmontes, 588 U.S. 15 (2009)).

In Richter, the Supreme Court addressed the limitations of the AEDPA as specifically applied to a claim of ineffective assistance of counsel that a state court has denied on the merits. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Richter, 562 U.S. at 101 (internal quotation marks and citation omitted). The Supreme Court bluntly acknowledged that "[i]f this standard is difficult to meet, that is because it was meant to be." Id. at 102.

> [The AEDPA] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.

Id. at 102-03 (internal quotation marks and citation omitted). When these limits imposed by the AEDPA intersect with the deference afforded counsel under Strickland, a petitioner's ability to obtain federal habeas relief is even more limited.

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's

representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so[.] The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard.

<u>Richter</u>, 562 U.S. at 105 (internal quotation marks and citations omitted).

At its core, Petitioner's challenge to the OCCA's decision is that it is unreasonable because it is never reasonable for trial counsel to fail to investigate, present, and prepare mitigation evidence. However, when a petitioner challenges the mitigation case put on by his trial counsel, it is not enough to simply show that more could have been done. The two-prong <u>Strickland</u> standard applies, and because the OCCA applied <u>Strickland</u> and evaluated the merits of Petitioner's claim, including the non-record evidence he presented in his Rule 3.11 motion, <u>Richter</u> makes it clear that to overcome the heightened deference afforded by <u>Strickland</u> and the AEDPA, Petitioner must do more than simply show the existence of other potentially mitigating evidence.

Having reviewed the mitigation evidence which Petitioner alleges trial counsel should have utilized, that information which Petitioner presented on direct appeal, the Court finds that Petitioner has failed to show that all fairminded jurists would disagree with the OCCA's assessment. Frost, 749 F.3d at 1225-26; Stouffer, 738 F.3d at 1221. Petitioner's evidence addresses the environment in which he was raised. However, some of this information the jury already knew: that Petitioner's mother was only fifteen years old when she became pregnant with him; that because of his mother's young age, his grandmother helped raise him; that his father was never a part of his life; that he was a good child, sweet and well-mannered; that he was not beaten or abused;[23] that he dropped out of school when he was in the eighth grade; that at age sixteen, he was sentenced as an adult and sent to prison for seven and a half years for a home invasion and robbery; that when he got out of prison, he was the victim of a drive-by shooting which nearly took his life; that a result of the shooting, he was in a coma for four months, and that even after his release from the hospital, his injuries required significant medical attention; that after this experience, he developed PTSD which manifested itself in fear and paranoia (he was afraid to even answer a knock at the door, afraid someone was coming to finish him off); and that he was a victim of Hurricane Katrina and came to Oklahoma as a result of being evacuated from New Orleans' Ninth Ward.

---

[23] For the most part, Petitioner's new evidence does not call into question this testimony. However, in 2008, Petitioner did self-report that he was sexually violated by a family friend on one occasion when he was thirteen years old. Petitioner's Exhibit 50 (filed under seal).

Petitioner's additional evidence highlights what it was like for him to grow up in New Orleans' Ninth Ward, an area stricken with poverty and crime and lacking in positive male role models. While this evidence speaks to the fact that Petitioner was not raised in a middle class home in the suburbs, it is not completely mitigating because it implies that Petitioner was a product of his surroundings. This evidence shows that his mother was not only young, but that she used drugs,[24] and while Petitioner looked up to an uncle, he was far from a good role model as he, too, was on drugs and involved in criminal activity.[25] This same evidence shows that Petitioner struggled in school, failed the sixth grade, and then began cutting class until he eventually dropped out; that he was arrested for burglary at the age of thirteen, and although he was ultimately found not guilty, he was charged for another burglary a year later for which he received three years probation[26] (and these incidents occurred before the home invasion and robbery that sent him to prison for seven years at the age of sixteen); that he was sexually active at a young age and fathered two children by age sixteen; that he began smoking pot at age eleven and was a regular cocaine user by age sixteen; that in addition to

---

[24] The extent to which her drug usage affected Petitioner is not entirely clear. While his mother admits to smoking cigarettes laced with crack, she denies doing so in the home and doubts that it had any affect on her sons. Petitioner's Exhibit 45. However, two of her relatives state that it was obvious that she had a drug addiction and that it negatively affected Petitioner. Petitioner's Exhibits 47 and 51.

[25] When Petitioner was a toddler, his uncle was shot at home by one of his aunt's boyfriends. Although Petitioner was nearby in the bathtub when this occurred, Petitioner's evidence does not show what affect this had on him, or that, given his age, he was even aware of what had occurred. Petitioner's Exhibits 45 and 46.

[26] According to Petitioner, his uncles taught him how to commit burglaries and how not to get caught by the police. Petitioner's Exhibit 50.

using drugs, by the age of fourteen, he sold them as well; and that due to the dangers involved in dealing drugs, he acquired and possessed weapons to protect himself (his first such weapons being 25mm and 38mm caliber handguns).

Although Petitioner's evidence may have "permit[ted] an inference that he is not as morally culpable for his behavior, it also might [have] suggest[ed] that [Petitioner], as a product of his environment, is likely to continue to be dangerous in the future." Ladd v. Cockrell, 311 F.3d 349, 360 (5th Cir. 2002). See Pinholster, 563 U.S. at 1410 (acknowledging that new evidence relating to the substance abuse and criminal activity of the petitioner's family "is also by no means clearly mitigating, as the jury might have concluded that [petitioner] was simply beyond rehabilitation"). Given the double-edged nature of Petitioner's new evidence, as well the abundance of evidence supporting multiple aggravating circumstances, the Court finds that the OCCA's decision is reasonable. Although Petitioner's new evidence highlights additional mitigation evidence, it simply does not equate to a finding by this Court that the OCCA's decision denying him relief amounts to a extreme malfunction which the AEDPA is designed to correct.

Petitioner's second claim of trial counsel ineffectiveness is the "Failure to Employ and Utilize Properly the Services of Mental Health Services." Petition, p. 71. Petitioner's particular complaint is that trial counsel failed with respect to Dr. Massad.

> Trial counsel were ineffective for failing to utilize [Dr. Massad] and failing to seek a more comprehensive assessment of not only the general effects PTSD has on a person's mind, but of the discrete components of trauma that defined [Petitioner's] life and mind and the effects these had on his behavior and thinking that night.

Id. at 73-74.  In support of this claim, Petitioner references Dr. Fritz's affidavit, which was included in his Rule 3.11 motion on direct appeal, along with an affidavit from Dr. Massad and six more affidavits from various experts, Petitioner's Exhibits 70 through 76.  These seven additional affidavits were presented to the OCCA for the first time in his second application for post-conviction relief.

There is a dispute between the parties as to when this claim was raised in state court proceedings.  Respondent asserts that this claim was not included in the claim Petitioner made on direct appeal, but that it was raised for the first time in Petitioner's second application for post-conviction relief.  Petitioner contends that it was a part of his direct appeal claim and that the OCCA acted unreasonably in denying him relief on it; however, Petitioner fails to make any citation and/or reference to the direct appeal record which supports his contention.  Having reviewed both Petitioner's brief on direct appeal and his Rule 3.11 motion, the Court agrees with Respondent that this claim was not presented to the OCCA within the claim he raised on direct appeal.

On direct appeal, Petitioner argued that trial counsel failed to investigate and present "additional mitigating evidence showing that [Petitioner] endured a miserable life of poverty and parental neglect during his childhood and adolescence, and that his circumstances in those years were far worse than the relatively benign picture of his life presented at trial."  Application for Evidentiary Hearing [Rule 3.11 motion], Case No. D-2007-1055, p. 1.  In his supporting argument, Petitioner detailed the new mitigating evidence he was able to obtain from his relatives and he argued that "[t]he testimony of these relatives would have provided

powerful support to Dr. Phillip Massad's testimony regarding [his] Post Traumatic Stress Disorder." Id. at 8. Nowhere within Petitioner's direct appeal claim does Petitioner allege that his trial attorneys were ineffective for their handling of Dr. Massad or failing to do more with mental health experts. Petitioner's argument on direct appeal that Dr. Massad's testimony could have been strengthened with additional mitigation evidence that his trial attorneys could have obtained from his relatives (and former girlfriends) does not encompass the claim Petitioner now presents. The claim Petitioner raises here was raised for the first time in his second post-conviction application and the OCCA found the claim waived due to Petitioner's failure to raise it on direct appeal or in his first post-conviction application. Simpson, No. PCD-2012-242, slip op. at 5. Although Petitioner attempts to overcome the application of a procedural bar to his claim based on the ineffectiveness of his trial, appellate, and post-conviction counsel, Reply, p. 21, for reasons previously discussed, these allegations do not constitute sufficient cause. See Ground 4, supra. Therefore, the Court concludes that Petitioner's second challenge to the effectiveness of his trial counsel is procedurally barred from review.

Petitioner also claims that his trial counsel was ineffective for failing to learn that the two surviving victims, Mr. Johnson and Ms. Emerson, were opposed to the death penalty. Petitioner's Exhibits 3 and 77. Petitioner contends that had the jury heard this evidence in mitigation, there is a strong possibility he would have been spared a death sentence. Petitioner raised this claim in his first post-conviction application. The OCCA found the claim waived because it could have been presented on direct appeal. Simpson, No. PCD-

2007-1262, slip op. at 5-6. In response to Respondent's argument that this claim is procedurally barred, Petitioner argues that appellate counsel ineffectiveness serves as cause. However, affording appropriate deference to the OCCA's merits determination that appellate counsel was not ineffective for failing to raise his claim in his direct appeal, id. at 8, the Court concludes that Petitioner has failed to show sufficient cause to overcome the imposition of a procedural bar to his claim. See Ground 10, supra.

## Other Evidence

With respect to other evidence, Petitioner first faults his trial counsel for conceding guilt in opening statement. Petitioner raised this claim on direct appeal, but was denied relief. Simpson, 230 P.3d at 905-06. While Petitioner argues that the OCCA's decision is unreasonable, Respondent counters that all fairminded jurists would not agree.

The record reflects that trial counsel gave a short opening statement in which he first highlighted Petitioner's personal circumstances. Counsel told the jury that Petitioner was a Hurricane Katrina victim, that he had a criminal past, and that he was the victim of a shooting, one which required an extended hospital stay. Counsel then stated, "When he came up here, he thought he could get a fresh start. It turned out he was bringing his troubles with him" (J. Tr. II, 227). Counsel then detailed the events that led up to the shooting before admitting that "Kendrick didn't do the right thing." Counsel continued:

> Jonathan Dalton was driving the car and Kendrick was sitting in the passenger seat, Latango Robertson was sitting in the back seat and they followed these three guys and eventually caught up with them and Kendrick shot into the car. And I know you're not going to like that.

> And in a normal case this is the point at which I would say, "Well, ladies and gentlemen, once you've heard all the evidence I'm going to ask you to find my client not guilty." I have a hard time doing that in this case because of what I just told you. And so, we're going to turn to the second stage of this case, in that part of the case. Bill Campbell [co-counsel] and I will cross-examine witnesses in this portion and we ask you to listen closely to that. We're going to have some points we want to make. I thank you for your attention.

(J. Tr. II, 228-29). On direct appeal, and in conjunction with his Rule 3.11 motion, Petitioner provided the OCCA with affidavits from both of his trial attorneys regarding opening statement and their trial strategy. In these affidavits, both attorneys acknowledge that their intended defense theory was Petitioner's PTSD and further state that "[i]t would be contradictory to assert that [Petitioner] was not the shooter, and then argue that PTSD reduced his ability to form malice aforethought when he fired the weapon." Both state that Petitioner was advised of this strategy and had no objection to it. In addition, although the trial court ruled just prior to the start of the trial that PTSD evidence would not be allowed in the first stage, see Ground 2, supra, both attorneys state that they proceeded with their original defense strategy so that their second stage case, "which would be based to a significant degree by the PTSD evidence, would not appear to be in conflict with [Petitioner's] first stage defense." Petitioner's Exhibits 79 and 80.

In denying Petitioner relief, the OCCA held as follows:

> The record reflects that during opening statements, defense counsel conceded that [Petitioner] was the shooter in the homicides. This concession was apparently made, with the consent of [Petitioner], in order to remain consistent with the intended defense built around [Petitioner's] claim of PTSD. After defense counsel told the jury that [Petitioner] was the shooter, he also told them that because of this concession, he would have a hard time asking them

75

to find [Petitioner] not guilty and would turn, at some point, to the second stage of trial. This second comment, [Petitioner] argues, was tantamount to a complete concession of guilt and was not made with [Petitioner's] knowing and intelligent consent. We disagree. With this comment, defense counsel did not concede that [Petitioner] was guilty of First Degree Murder. Rather, when the whole of the comments are taken together, it is clear that defense counsel, in accord with his claim that [Petitioner] suffered from PTSD, conceded that his client would be guilty of a lesser form of homicide. The concession made by defense counsel with the consent of [Petitioner] cannot be found to constitute ineffective assistance of counsel.

Simpson, 230 P.3d at 905.[27]

Petitioner disagrees with the OCCA's characterization of his counsel's comments. Petitioner contends that the comments were a clear admission of guilt to first degree murder. Petitioner asserts that his consent to the trial strategy developed by his counsel did not extend that far, and that in any event, when the PTSD evidence was not allowed in the first stage, counsel should have either revised their strategy or obtained a new consent from him. Petitioner asserts that he was prejudiced by the error. Petition, pp. 77-78; Reply, pp. 22-23.

In Florida v. Nixon, 543 U.S. 175 (2004), the Supreme Court acknowledged that conceding guilt in the first stage of a capital proceeding may be a reasonable trial strategy.

Although such a concession in a run-of-the-mine trial might present a closer question, the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus. Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming and the

---

[27] It is clear that the OCCA considered the affidavits of trial counsel in its determination of this claim. Simpson, 230 P.3d at 905-06.

crime heinous. In such cases, "avoiding execution [may be] the best and only realistic result possible."

> Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared. Unable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive at the guilt phase to avoid a counterproductive course. In this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in "a useless charade."

Id. at 190-92 (citations omitted) (footnote omitted). The Court additionally found that while counsel should discuss trial strategy with their client, they are not required to obtain their client's express consent before conceding guilt. Id. at 189, 192. See Lockett, 711 F.3d at 1247 (acknowledging this holding in Nixon). Whether counsel was ineffective in conceding guilt is a determination to be made under the Strickland standard. Id. at 192. See Lockett, 711 F.3d at 1246-49 (applying Nixon and Strickland to find that the OCCA reasonably denied a petitioner's ineffectiveness claim based on a concession of guilt).

Petitioner has not shown that the OCCA acted unreasonably in denying him relief under Strickland. In opening statement, trial counsel admitted that Petitioner shot into the victims' car. Given the facts and circumstances of Petitioner's crimes, see Ground 7, supra (discussing the first stage evidence as it related to the aggravating circumstances), which included the testimony of his two co-defendants, this was a reasonable strategy without prejudice to Petitioner. Irrespective of the fact that the PTSD evidence was not allowed in the first stage, admitting Petitioner's participation not only played into Petitioner's second stage case, but it was also consistent with a voluntary intoxication defense, for which the jury

was instructed and for which counsel argued in closing in an effort to convince the jury to find Petitioner guilty of the lesser-included offense of first degree manslaughter (O.R. III, 563-68; J. Tr. VI, 83-97). Accordingly, the Court denies relief for this claim.

Next, Petitioner faults his trial counsel for failing to impeach Mr. Collins with information obtained from Jason Spike, who was incarcerated with both Petitioner and Mr. Collins in the Oklahoma County Jail. Relying upon an affidavit from Mr. Spike contained in his Rule 3.11 motion, Petitioner raised this claim on direct appeal.[28] However, the OCCA denied relief as follows:

> Next [Petitioner] argues that trial counsel was ineffective for failing to call a witness to impeach Collins' credibility by testifying that Collins was an opportunist who would lie and perjure himself in order to get a better deal for himself. This information was basically revealed at trial through both direct and cross-examination of Collins. While defense counsel certainly could have called this witness, [Petitioner] has not shown a reasonable probability that, but for counsel's alleged unprofessional error in not doing so, the result of the proceeding would have been different.

Simpson, 230 P.3d at 905.[29]

In his challenge to the OCCA's holding, Petitioner argues that although trial counsel was able to demonstrate that Mr. Collins lied about his "football glory," the testimony which

---

[28] Petitioner presented an expanded version of this claim in his second application for post-conviction relief. Tying this expanded version to his Brady claim, Petitioner claimed in a footnote there, as he does here, that trial counsel was ineffective for failing to obtain any additional impeachment evidence that fell outside of the prosecution's duty to disclose. Petition, p. 79 n.38; Verified Successive Application for Post-Conviction Relief, Case No. PCD-2012-242, pp. 32-33 & n.20. The OCCA found this expanded claim waived. Simpson, No. PCD-2012-242, slip op. at 5.

[29] It is clear that the OCCA considered Mr. Spike's affidavit in its determination of this claim. Simpson, 230 P.3d at 905-06.

could have been presented through Mr. Spike was far more powerful because it was a "straight forward rebuttal of the key issue of dangerousness." Petition, pp. 79-80. But here again, Petitioner views Mr. Collins' testimony in isolation, overlooking all of the other evidence which supported the jury's finding that he was a continuing threat, the evidence supporting the other aggravating circumstances, and the information about Mr. Collins that came out at trial. See Grounds 7 and 9, supra. In light of all of the presented evidence, it was not unreasonable for the OCCA to find that Petitioner's trial counsel was not ineffective for failing to present Mr. Spike as a witness.

Petitioner's third complaint relates to the alleged conflict of interest which arose because Petitioner used the same investigator who assisted one of his co-defendants. This claim has been thoroughly addressed in Ground 13, supra, and need not be restated here. For the reasons set forth therein, relief is denied here as well.

In his fourth complaint, Petitioner argues that his trial counsel was ineffective for failing to present evidence to counter the State's assertion that the weapon he used was a semi-automatic. In his fifth complaint, Petitioner asserts that his trial counsel was ineffective for failing to object to the instructions given with respect to Count 4. Both of these claims were raised by Petitioner in his first application for post-conviction relief. The OCCA found these claims waived because they could have been presented on direct appeal. Simpson, No. PCD-2007-1262, slip op. at 4-5. The OCCA additionally determined that his appellate counsel was not ineffective for failing to raise these claims on direct appeal. Id. at 8. As previously noted in Ground 10, supra, because the OCCA addressed the merits of Petitioner's

stated cause, AEDPA deference applies, and because Petitioner has not shown the OCCA's

Strickland determination is unreasonable, he has not overcome the application of a

procedural bar to these claims.  Ryder, 810 F.3d at 746; Turrentine, 390 F.3d at 1202.

### Failing to Preserve the Record

Of the eleven allegations relating to trial counsel's failure to preserve the record,

eight[30] were raised on direct appeal and denied by the OCCA in large part because the

underlying claim lacked merit:

> [Petitioner] first argues that trial counsel was ineffective for failing to object to the introduction of inadmissible evidence, improper tactics and argument of the prosecutors, the trial court's rulings precluding the admission of defense evidence and the submission of improper jury instructions and verdict forms. These alleged failings concern issues raised and addressed above. We found in Proposition I, that the evidence of [Petitioner's] PTSD was inadmissible in first stage of trial and properly precluded. We found in Proposition III that an instruction on Second Degree Depraved Mind Murder was not warranted by the evidence. In Proposition V, we found that while the letters at issue were in fact hearsay for which no exception applied, the information contained within them was cumulative to properly admitted evidence and thus, their admission was harmless. In Proposition VI, we found that none of the alleged improper comments made by the prosecutor could be found to have affected the jury's finding of guilt or assessment of punishment. We found in Proposition VII, that the jury instructions, when taken as a whole, adequately stated the applicable law on the defense of voluntary intoxication and the prosecutor's arguments were largely correct and proper statements of the law. In Proposition VIII, we found that Detective George did not give improper opinion testimony or improperly vouch for the credibility of other witnesses. In Proposition XI, we found that the heinous, atrocious or cruel aggravating circumstance was proven beyond a reasonable doubt as to the murder of Glen Palmer. Although this aggravating circumstance was stricken as to the murder of Anthony Jones, [Petitioner's] jury did not consider improper aggravating

---

[30] Petitioner's numbers 1 through 6, 8, and 9.  These eight relate to Petitioner's Grounds 1 through 3, 6 through 8, 11, and 12.

> evidence in deciding punishment. In Proposition XII, we found that the jurors'
> consideration of the evidence offered in mitigation in this case was not unfairly
> limited. Most of these alleged failings do not reflect a deficient performance
> by defense counsel and [Petitioner] has not shown a reasonable probability
> that, but for counsel's alleged unprofessional errors, the result of the
> proceeding would have been different.

Simpson, 230 P.3d at 904. Given the lack of merit to the underlying claims, trial counsel cannot be deemed ineffective for their actions (or inactions) with respect thereto, and the decision of the OCCA rejecting these claims cannot be judged unreasonable as to warrant AEDPA relief. Hanson, 797 F.3d at 837, 839 (refusing to analyze a petitioner's ineffectiveness claim based on trial counsel's failure to object to instances of prosecutorial misconduct where the underlying instances of alleged misconduct were without merit). See Freeman v. Attorney General, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim . . . ."); Snow v. Sirmons, 474 F.3d 693, 724-25 (10th Cir. 2007) (trial counsel was not ineffective for failing to object to certain evidence that the OCCA found admissible); Spears, 343 F.3d at 1249 (trial counsel was not ineffective for failing to object to the giving of a flight instruction where the OCCA found that sufficient evidence supported the giving of the instruction).

Related to his Ground 16, infra, Petitioner's seventh allegation concerns trial counsel's failure to life qualify the jury. Although Petitioner raised this claim in his direct appeal brief, the OCCA overlooked the issue in its original opinion, but subsequently granted rehearing to address it. Simpson, 239 P.3d at 155. Relief was denied as follows:

> We find that even if trial counsel's performance was deficient for failing to
> "life qualify" the jury, there has been no showing of any resulting prejudice to

81

> [Petitioner]. <u>See</u> <u>Neill v. Gibson</u>, 278 F.3d 1044, 1054–56 (10th Cir.2001) (to prevail on a claim of ineffective assistance of counsel for failing to life qualify the jury, an appellant must show "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." <u>Strickland</u>, 466 U.S. at 695, 104 S.Ct. 2052, 80 L.Ed.2d 674.)

<u>Id.</u>  Petitioner does not even address the OCCA's holding, but states only that trial counsel's error denied him a fair trial.  Petition, p. 89.  Because Petitioner has failed to show that the OCCA acted unreasonably in denying this claim, relief is unwarranted.  <u>See</u> <u>Thomas v. Horn</u>, 570 F.3d 105, 121-22 (3rd Cir. 2009) (denying a petitioner habeas relief based on his trial counsel's failure to life qualify all the jurors and finding, among other reasons, that denial was warranted because the petitioner had failed to provide "a shred of evidence suggesting any probability that, had his trial counsel life-qualified every juror, at least one juror would have voted to sentence [him] to life imprisonment").

Petitioner's tenth allegation faults his trial counsel for not objecting to references to his prior conviction which were made from the start of trial.  Petitioner raised this claim in his first application for post-conviction relief.  The OCCA found the claim waived because it could have been raised on direct appeal.  <u>Simpson</u>, No. PCD-2007-1262, slip op. at 3-4. The OCCA also found that his appellate counsel was not ineffective for failing to raise the claim.  <u>Id.</u> at 8. Again, as noted above, because the OCCA addressed the merits of Petitioner's stated cause, AEDPA deference applies and Petitioner can only overcome the application of a procedural bar to his claim if he shows that all fairminded jurists would agree that the OCCA got it wrong.  Given the great evidence of guilt, the Court finds that all

reasonable jurists would not disagree with the OCCA's determination. Therefore, this claim is procedurally barred.

Petitioner's final allegation is trial counsel's failure to object to the trial court's announcement that he was in custody and would be escorted by a deputy to all proceedings. Petitioner raised this claim in his second application for post-conviction relief. The OCCA found the claim waived due to Petitioner's failure to raise it on direct appeal or in his first post-conviction application. Simpson, No. PCD-2012-242, slip op. at 5. Like the underlying substantive claim, Ground 4, supra, which was also presented to the OCCA in Petitioner's second post-conviction application, Petitioner's assertion that his default should be excused due to the ineffective assistance of all of his prior counsel–trial, appellate, and post-conviction–lacks merit. Therefore, this claim is also procedurally barred.

For the foregoing reasons, the Court concludes that Petitioner is not entitled to relief on his fourteenth ground for relief.

### O.    Ground 15:  Ineffective Assistance of Appellate Counsel.

In Ground 15, Petitioner faults his appellate counsel and his post-conviction counsel for failing "to fully develop and present all instances of prior [trial] counsel's ineffectiveness" as set forth in his Ground 14. Petition, p. 92. In addressing Petitioner's Ground 14, the Court has for all practical purposes adjudicated this ground as well. Either trial counsel was not ineffective and therefore appellate counsel was not ineffective for failing to raise an unmeritorious claim, or the trial counsel ineffectiveness claim was procedurally barred and appellate counsel's alleged ineffectiveness with respect thereto was

not sufficient cause. As to the alleged ineffectiveness of his post-conviction counsel, the Court has likewise shown that this claim does not state a claim upon which federal habeas relief may be granted. For all of these reasons, Petitioner's Ground 15 is hereby denied.

### P.    Ground 16:  Inadequate Voir Dire.

In Ground 16, Petitioner asserts that the voir dire conducted in his case was constitutionally inadequate because the trial court did not sua sponte ask the prospective jurors whether they would automatically impose the death penalty. Petitioner raised this claim on direct appeal and was denied relief. Simpson, 230 P.3d at 901-02. Petitioner asserts that the OCCA's holding is an unreasonable application of Morgan v. Illinois, 504 U.S. 719 (1992). Petitioner also challenges the OCCA's factual determination that he did not make a request to life qualify the jury. For the following reasons, Ground 16 is denied.

In Morgan, the Supreme Court found that the "[p]etitioner was entitled, *upon his request*, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty." Morgan, 504 U.S. at 736 (emphasis added).[31] In denying Petitioner relief on this

_____

[31] In arriving at this holding, the Supreme Court set forth the following analysis:

[T]he belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law. Any juror who would impose death regardless of facts and circumstances of conviction cannot follow the dictates of law. It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. A defendant on trial for

claim, the OCCA acknowledged the holding of <u>Morgan</u> and its adherence to it.  However, the OCCA correctly stated that "neither the United States Supreme Court nor this Court has held that the trial court is required to ask life qualifying questions to the jury absent a request to do so," and in the absence of "legal authority to the contrary," the OCCA denied Petitioner relief.  <u>Simpson</u>, 230 P.3d at 902.  Because the OCCA directly applied the holding of <u>Morgan</u>, Petitioner's claim is completely without merit.[32]

Regarding Petitioner's factual challenge to the OCCA's holding, the Court notes that in its evaluation of Petitioner's claim, the OCCA found as follows:

> The record reflects that after the trial court and both parties had completed voir dire and the panel had been passed for cause, the trial court noted on the record that defense counsel had not requested that the court voir dire the jurors on whether they would automatically impose the death penalty.  The trial court noted additionally that such an inquiry would have been required by law if a request had been made.

<u>Id.</u>  Referencing a memorandum of law he filed some five months before trial regarding his objection to the State's death qualification of the jury and discussing "the Structure and

---

his life **must be permitted** on *voir dire* to ascertain whether his prospective jurors function under such misconception.

<u>Id.</u> at 735-36 (emphasis added) (footnote omitted) (citations omitted).

[32] Petitioner additionally contends that the OCCA's decision is an unreasonable application of <u>Hicks v. Oklahoma</u>, 447 U.S. 343 (1980).  Petitioner argues: "Permitting the trial judge to ignore not only the principles of <u>Morgan</u>, but also Oklahoma law designed to prevent violations of <u>Morgan</u> arbitrarily, deprived [Petitioner] of his 14th Amendment due process rights to a fair and impartial trial." Petition, p. 95.  As discussed herein, there was no <u>Morgan</u> violation, and in addition, Petitioner has failed to make a showing that Oklahoma law extends further than <u>Morgan</u>.  Although the OCCA noted the prudence in asking whether a prospective juror would automatically impose the death penalty, and even encouraged it as a best practice, it is not a state law requirement. <u>Simpson</u>, 230 P.3d at 902 & n.8.

Scope of Appropriate Voir Dire in a Capital Case," Petitioner asserts that this shows he made a request to life qualify the jury (O.R. I, 86-107). The Court disagrees. First, this filing is more akin to a law review article than a motion or a request. But even if it is construed as a request, the fact remains that Petitioner, unlike <u>Morgan</u>, was not prohibited from life qualifying the jury. In <u>Morgan</u>, defense counsel, during voir dire, requested the trial court to ask the following question: "'If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?'" The trial court denied the request. <u>Morgan</u>, 504 U.S. at 723. In Petitioner's case, he never even attempted to ask life-qualifying questions. In light of <u>Morgan</u>, he was permitted to, but he simply did not. Second, when the trial court made its statement regarding the absence of a request, Petitioner presented no challenge to the same (J.Tr. II, 202). Surely if the trial court had misrepresented the facts or if trial counsel desired to ask the prospective jurors more questions, counsel would have spoken up at that time. Third, on appeal, not once but twice, Petitioner acknowledged to the OCCA in his filings that he had made no such request at trial. Brief of Appellant, Case No. D-2007-1055, p. 75 ("Here, the trial court did not refuse a request by defense counsel to have jurors questioned as to whether they would automatically impose death upon a finding of guilt."); Reply Brief of Appellant, Case No. D-2007-1055, p. 16 ("Appellant made clear in his brief in chief that his situation was different from that in <u>Morgan</u>, in that his complaint was not that a defense request to life qualify was denied but rather that the trial court erred in failing to qualify the jury even absent such a request."). For

all these reasons, Petitioner has failed to show that the OCCA's decision is factually unreasonable.

Ground 16 is denied.

**Q.      Ground 17:  Count 4 Stipulation.**

In Ground 17, Petitioner contends that the trial court violated his constitutional rights when it informed the jury that he had stipulated to possession of a firearm after former felony conviction (Count 4) and that the only issue the jury needed to determine with respect to Count 4 was punishment.  Petitioner asserts that the trial court's action amounted to a directed verdict for the State on Count 4.  Petitioner raised this claim in his first post-conviction application, but the OCCA declined to address it because Petitioner could have raised it on direct appeal.  Simpson, No. PCD-2007-1262, slip op. at 6-7.  The OCCA additionally found that appellate counsel was not ineffective for failing to raise the claim on direct appeal.  Id. at 8.  Like Ground 4, Respondent asserts that the claim is procedurally barred, and Petitioner argues that the OCCA's finding of waiver is neither adequate nor independent, that appellate counsel ineffectiveness satisfies cause, and that a fundamental miscarriage of justice will occur if the Court fails to address the merits of the claim.

For the same reasons set forth in Ground 4, supra, the Court concludes that Petitioner's challenges to the OCCA's application of Section 1089 to his claim are without merit.  The Court additionally finds that, as in his Ground 10, Petitioner's simple reference to the fundamental miscarriage of justice exception is insufficient to meet it.  Petition, p. 96. And finally, Petitioner has not demonstrated cause by placing blame on his appellate counsel.

Giving appropriate deference to the OCCA's merits determination that appellate counsel was not ineffective for failing to raise his Ground 17 in his direct appeal, <u>see</u> Ground 10, <u>supra</u>, the Court concludes that Petitioner has failed to show sufficient cause to overcome the imposition of a procedural bar to his claim. <u>See</u> <u>Johnson v. Cowley</u>, 40 F.3d 341, 344-46 (10th Cir. 1994) (rejecting a petitioner's claim that the trial court's instructions resulted in a directed verdict and finding that "the fact of a former conviction used for enhancement purposes is an evidentiary fact to which a defendant can stipulate like any other fact"). Therefore, the Court concludes that Petitioner's Ground 17 is procedurally barred.

### R.     Ground 18:  Cumulative Error.

In his final ground, Petitioner argues for relief based on cumulative error. "Under cumulative error review, a court 'merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" <u>Jackson</u>, 805 F.3d at 955 (quoting <u>Hamilton</u>, 436 F.3d at 1196).[33]

The record reflects that Petitioner raised a cumulative error claim on direct appeal and in both of his applications for post-conviction relief. On direct appeal, the OCCA found two errors, the one set forth in his Ground 7, <u>supra</u>, regarding the admission of the letters written by Mr. Collins, and the HAC aggravator as it related to Mr. Jones (<u>see</u> n.2, <u>supra</u>). <u>Simpson</u>,

---

[33] In <u>Eizember</u>, the Tenth Circuit recently acknowledged its "murky" position "on 'whether the need to conduct a cumulative-error analysis is clearly established federal law' for AEDPA purposes . . . ." <u>Eizember</u>, 803 F.3d at 1148 n.8 (quoting <u>Hooks</u>, 689 F.3d at 1194 n.24).

230 P.3d at 898, 903. In denying Petitioner cumulative error relief, the OCCA found "that although [Petitioner's] trial was not error free, any errors and irregularities, even when considered in the aggregate, do not require relief because they did not render his trial fundamentally unfair, taint the jury's verdict, or render sentencing unreliable. Any errors were harmless beyond a reasonable doubt, individually and cumulatively." Simpson, 230 P.3d at 906. In both of his post-conviction proceedings, the OCCA found no errors to support a cumulative error analysis. Simpson, No. PCD-2012-242, slip op. at 8; Simpson, No. PCD-2007-1262, slip op. at 8-9.

In his petition, Petitioner makes no argument that the OCCA acted unreasonably in denying him relief, but instead presents only a generic claim for relief. Petition, pp. 97-98. In his reply, Petitioner provides a little more insight into his claim by arguing his entitlement to relief based on errors found harmless by the OCCA and errors found by this Court. Reply, p. 25. However, of the seventeen other grounds for relief presented by Petitioner, only Ground 7 was found to be harmless by the OCCA and by this Court, and this Court has found no other errors. Consequently, the only issue that needs to be addressed here is whether the OCCA unreasonably denied Petitioner relief when it rejected the cumulative error argument he raised on direct appeal.

The Court finds nothing unreasonable with the OCCA's decision. Having thoroughly analyzed Petitioner's Ground 7, the Court harbors no doubt to as its harmlessness. Regarding the stricken HAC aggravator with respect to Mr. Jones, the OCCA analyzed the error as follows:

We must now consider what relief, if any, is required. "An invalidated sentencing factor . . . will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." Brown v. Sanders, 546 U.S. 212, 220, 126 S.Ct. 884, 892, 163 L.Ed.2d 723 (2006). "If the jury could have properly considered the evidence used to support the invalidated aggravator anyway because it also supported a separate and valid aggravator, the death sentence will stand." Jackson, 2006 OK CR 45, ¶ 44, 146 P.3d at 1164. Under such circumstances, the jury has not considered any improper evidence and has not weighed any improper aggravating evidence against the mitigating evidence in arriving at its sentence. Id. Since there was really no evidence presented to the jury in support of the especially heinous, atrocious or cruel aggravating circumstance with regard to the murder of Anthony Jones, we find that [Petitioner's] jury did not consider improper aggravating evidence in deciding punishment. Thus, the jury's weighing process of mitigating evidence against aggravating circumstances was not skewed. See Jackson, 2006 OK CR 45, ¶ 45, 146 P.3d at 1164. This claim is rejected.

Simpson, 230 P.3d at 903. The OCCA's analysis of the HAC error is reasonable, as is its determination that Petitioner suffered no greater injury when this error is considered in tandem with the erroneous admission of hearsay with respect to Mr. Collins. Relief is therefore denied as to Petitioner's Ground 18.

## V. Motions for Discovery and Evidentiary Hearing.

Petitioner has filed a motion for discovery (Doc. 42) as well as a motion for an evidentiary hearing (Doc. 51). For the following reasons, the Court finds that both should be denied.

Petitioner's discovery request relates to his Ground 9 and his allegation that the prosecution withheld Brady material. The vast majority of his motion concerns Mr. Collins and Petitioner's contention that the State withheld evidence which could have been used to

impeach him. In denying Petitioner relief on this ground, the Court has found that it is both procedurally barred and unmeritorious. In reaching this conclusion, the Court has considered the wealth of information which Petitioner has provided regarding Mr. Collins' credibility. In his discovery request, Petitioner searches for more like-kind evidence. However, the Court has concluded that even if Mr. Collins had been severely impeached (or his testimony excluded entirely), the balance of the evidence supports the conclusion that Petitioner would have been sentenced to death in any event. See Ground 9, supra. Thus, even if Petitioner were to find additional evidence affecting Mr. Collins' credibility, it would not affect the Court's conclusion. See Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts (requiring good cause to obtain discovery authorization). Petitioner's request for discovery on this basis is therefore denied.

Petitioner also requests discovery in an effort to learn whether the prosecution knew that the surviving victims, Mr. Johnson and Ms. Emerson, were opposed to the death penalty. In support of his request, Petitioner asserts that "Oklahoma County prosecutors normally solicit, or at least often obtain such recommendations from victims and victims' family members." Doc. 42 at 5. In their affidavits, both of these witnesses state their opinion and further state that defense counsel never asked them about it; however, neither make any statement that they told the State this information. Petitioner's Exhibits 3 and 77. In addition, Petitioner fails to show how this information, if obtained, would support his entitlement to relief. See Bracy v. Gramley, 520 U.S. 899, 908-09 (1997) (equating "good cause" to a

pleading of specific allegations showing that a petitioner would be entitled to relief if the facts are fully developed).

In addition to his discovery request, Petitioner requests an evidentiary hearing with respect to his Grounds 9, 13 (conflict of interest), 14 (ineffective assistance of trial counsel), and 15 (ineffective assistance of appellate counsel). "The purpose of an evidentiary hearing is to resolve conflicting evidence." Anderson v. Attorney General of Kansas, 425 F.3d 853, 860 (10th Cir. 2005). If there is no conflict, or if the claim can be resolved on the record before the Court, then an evidentiary hearing is unnecessary. Id. at 859.

For the reasons set forth above, it is clear that an evidentiary hearing is unwarranted on Ground 9 to resolve Petitioner's Brady/Napue claim related to Mr. Collins. Again, because the Court has concluded that Petitioner would not be entitled to relief even if Mr. Collins' testimony was completely discounted or excluded, there is no reason to explore this claim any further. As for his Grounds 13, 14, and 15, Petitioner has simply not shown why an evidentiary hearing is warranted. In the first instance, many of the claims contained within these grounds are procedurally barred, and an evidentiary hearing is unnecessary to make this legal determination. See McCleskey v. Zant, 499 U.S. 467, 494 (1991) ("The petitioner's opportunity to meet the burden of cause and prejudice will not include an evidentiary hearing if the district court determines as a matter of law that petitioner cannot satisfy the standard."). In addition, as to the claims which the Court addressed on the merits, the Court has given due consideration to the materials Petitioner provided to the OCCA in support and determined that no relief under Section 2254 is warranted. Consequently, the

Court is precluded by the AEDPA and <u>Pinholster</u> from entertaining new evidence on these claims. <u>Pinholster</u>, 563 U.S. at 185 ("evidence introduced in federal court has no bearing on § 2254(d)(1) review"); <u>Jones v. Warrior</u>, 805 F.3d 1213, 1222 (10th Cir. 2015) (citing <u>Pinholster</u> and denying a request for an evidentiary hearing due to a petitioner's failure to satisfy Section 2254(d)); <u>Wood v. Trammell</u>, No. CIV-10-829-HE, 2015 WL 6621397, at *36 (W.D. Okla. Oct. 30, 2015) ("petitioner is not entitled to an evidentiary hearing on claims in which this court has denied relief pursuant to Section 2254(d) because those claims are reviewed in light of the record before the OCCA").

## VI.  Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to his requested relief. Accordingly, Petitioner's Petition (Doc. 23), motion for discovery (Doc. 42), and motion for an evidentiary hearing (Doc. 51) are hereby **DENIED**.  A judgment will enter accordingly.

IT IS SO ORDERED this 25th day of May, 2016.


VICKI MILES-LaGRANGE
UNITED STATES DISTRICT JUDGE